**UNITED STATES of America,**
**Appellee,**

v.

**Miguel A. FLECHA–MALDONADO,**
**Defendant, Appellant.**

No. 02–2404.

United States Court of Appeals,
First Circuit.

Heard May 6, 2004.

Decided June 28, 2004.

John F. Cicilline, for appellant.

David Rivera, Assistant U.S. Attorney, with whom Sonia I. Torres–Pabón, Assistant U.S. Attorney, and H.S. Garcia, U.S. Attorney, were on brief, for appellee.

Before TORRUELLA, Circuit Judge, LYNCH, Circuit Judge, and LIPEZ, Circuit Judge.

LYNCH, Circuit Judge.

Miguel A. Flecha–Maldonado, a former officer of the Puerto Rico Police Department, was corrupted by the lure of drug money. After being caught in an FBI sting operation transporting what he believed to be cocaine for a Columbian drug trafficker, he was convicted by a jury of three federal crimes. He now appeals these convictions. We affirm. In doing so, we discuss several practices in federal criminal prosecutions in Puerto Rico that we discourage.

## I.

For approximately one year, the FBI investigated widespread corruption within the Puerto Rico Police Department in an operation appropriately named "Honor Perdido," or "Lost Honor."

The investigation was triggered by the May 2000 arrest of a Puerto Rico police officer, Arturo Guillermo Ortiz–Colón, for the sale of heroin. Ortiz–Colón, in a post-arrest interview with FBI agent Jeffrey Pelaez, explained that for some time numerous officers in the Puerto Rico Police Department had been committing crimes, such as home invasions, robberies and theft. In exchange for leniency, Ortiz–Colón agreed to assist in FBI investigations by contacting corrupt police officers and recording incriminating statements. To facilitate these investigations, the FBI concealed Ortiz–Colón's arrest[1] and created a fake position for him as an FBI task force agent. The investigation included twelve different operations and targeted about thirty-two active and former Puerto Rico police officers.

One of the operations focused on a pair of officers, appellant Flecha–Maldonado and Mahmud Juma–Pineda, and one former officer, José Serrano–Beauvaix (a.k.a. "Pollo"). Ortiz–Colón had identified all three as having already participated in criminal activity. And Serrano–Beauvaix had already been fired from his position as an officer after being arrested for burglary.

On October 25, 2000, the FBI instructed Ortiz–Colón to contact these three individuals and tell them that he had met a

---

1. Ortiz–Colón's drug prosecution was brought in federal court so that his identity could be protected and his former fellow officers would not learn about his arrest. He entered a plea and cooperation agreement.

Columbian drug trafficker named El Viejo who wanted armed police to transport and protect large shipments of cocaine. Such police protection for the drug shipments would both ward off potential legitimate police stops and provide protection from theft by rival drug gangs. Ortiz–Colón contacted them as instructed, and each agreed to transport the drugs on the following day. In a recorded telephone conversation, Ortiz–Colón told Flecha–Maldonado that the group would be paid two thousand dollars for each kilogram of cocaine that was transported and that the shipment would be somewhere between five and fifty kilograms.

The next day, October 26, Juma–Pineda, Serrano–Beauvaix, and Flecha–Maldonado met at Ortiz–Colón's apartment, which the FBI had wired for video and audio recording. The group discussed the planned transport of the drugs from Ortiz–Colón's apartment to an awaiting drug trafficker's vehicle in Humacao, Puerto Rico. At some point, an undercover agent, playing the part of a drug trafficker in the concocted Columbian drug organization, arrived at the apartment and delivered a cooler filled with sham cocaine. The cooler was placed in the trunk of a Chevy Lumina that the FBI had provided to Ortiz–Colón and had wired to record audio and video.

Flecha–Maldonado, Juma–Pineda, and Ortiz–Colón, who was the driver, got into the Lumina containing the sham cocaine. Because Serrano–Beauvaix had been fired from the police force, the group concluded that he should travel in a separate car and provide surveillance. Followed by the car Serrano–Beauvaix was driving, the three officers drove the Lumina with the sham cocaine to the appointed destination in Humacao, which was a parking lot next to a Sam's Club. During the trip, Flecha–Maldonado and Juma–Pineda kept a look-out for any suspicious cars that might contain either other police officers or rival gangsters. At one point during the drive, Juma–Pineda pulled out his police-issued firearm and began to clean it in plain view.

When the three officers arrived at the designated parking lot in Humacao and spotted the car in which they were supposed to leave the drugs, either Flecha–Maldonado or Juma–Pineda noticed several surveillance cameras and told Ortiz–Colón that the drop-off should take place elsewhere. The three settled on a nearby location and Ortiz–Colón telephoned his FBI contact, whom he pretended was El Viejo, and informed him of the new plan. Juma–Pineda then retrieved the keys to the designated car, which were stored behind the car's bumper, and drove it to the new location. He was followed by Ortiz–Colón and Flecha–Maldonado in one car and Serrano–Beauvaix in the third car. Once they arrived at the new location, the sham cocaine was finally placed into the trunk of the designated car, and the group immediately headed back to the Westin Rio Mar.

Flecha–Maldonado was paid $5,000 for his services: he was told that the shipment totaled ten kilograms, resulting in a $20,000 payment to be split four ways. In the end, the FBI had made recordings of the initial telephone conversations, the meeting in Ortiz–Colón's apartment and the delivery of the sham cocaine there, the conversations and actions in the car containing the sham cocaine, and the final delivery of the supposed drugs. The recorded conversations were in Spanish, which was the common language of the group.

These events led to the indictment of Flecha–Maldonado, along with Juma–Pineda and Serrano–Beauvaix, for three feder-

al crimes and a fourth forfeiture count.[2] Count One charged the defendants with conspiring to distribute more than five kilograms of cocaine, 21 U.S.C. §§ 841(a)(1) & 846; Count Two charged them with aiding and abetting the distribution of more than five kilograms of cocaine, id.; and Count Three charged them with carrying a firearm in furtherance of a drug-trafficking crime, 18 U.S.C. § 924(c)(1)(A). Before trial, Juma–Pineda and Serrano–Beauvaix both pled guilty, but Flecha–Maldonado rejected a plea agreement proffered by the government. At trial, the principal evidence was the testimony of Ortiz–Colón and Agent Pelaez and the various video and audio tapes. A jury found Flecha–Maldonado guilty on all three counts; it also found for the government on the forfeiture count, which required Flecha–Maldonado to forfeit the $5,000 payment he received from Ortiz–Colón.

Flecha–Maldonado was sentenced to 160 months of imprisonment on Counts One and Two, to be served concurrently, plus a consecutive sentence of 60 months on Count Three. In addition to the total imprisonment term of 220 months, he also received a supervised release term of five years and a special monetary assessment of $300.

## II.

Flecha–Maldonado argues that there were four errors at his trial that require reversal of his conviction: (1) the denial of his first motion for a continuance; (2) the refusal to declare a mistrial or grant a continuance due to the prosecution's delays in providing English transcripts of the Spanish conversations on the audio tapes it used at trial; (3) the admission of impermissible character evidence; and (4) the

denial of his motion for a judgment of acquittal on the firearm count.

He also makes two arguments regarding his sentence. First, he argues that his position as a police officer did not afford him sufficient discretion in performing his duties to warrant his sentence enhancement for abuse of a "position of trust." Second, he claims that the district court denied his request for a downward departure because it incorrectly believed that it did not have authority to consider such a departure.

We reject each of the grounds asserted on appeal. None of Flecha–Maldonado's arguments that he was denied a fair trial has merit and his sentence was plainly within the range of options open to the district court.

### A. Trial

#### 1. Denial of Continuance Prior to Trial

Defendant was represented from several months prior to his November 29, 2001 arraignment through the start of trial by Attorney Antonio Bauzá–Torres. On March 12, 2002, the trial judge held a status conference and set a trial date of May 6, 2002. A little over a week after the status conference, on March 21, Flecha–Maldonado moved for the withdrawal of Attorney Bauzá–Torres. On the same day, Attorney John Cicilline, who is counsel on this appeal, filed an appearance for the defendant. Although the court denied Attorney Bauzá–Torres's motion to withdraw, Attorney Cicilline filed an informative motion with the court on April 18 representing that he would be ready and available for the May 6 trial date.

---

**2.** There were two additional counts in the indictment that charged only Flecha–Maldo-
nado's co-defendants.

Some time in late April, after he filed the informative motion agreeing to the May 6 trial date, Attorney Cicilline says that he agreed to try an unrelated case that was also scheduled to start on May 6. Several days later, after receiving written notice that Flecha–Maldonado's trial was indeed set for May 6, Attorney Cicilline claims that he filed a motion notifying the judge in this case of the conflict and requesting a continuance.[3] According to Attorney Cicilline, the trial judge responded that, in the event of a conflict, Flecha–Maldonado's trial would proceed as scheduled on May 6, but would be conducted from 5 p.m. until 9 p.m.

Three days before the scheduled start of the trial, Flecha–Maldonado filed a second motion requesting the withdrawal of Attorney Bauzá–Torres. The court denied this motion on the same day, saying in the accompanying order that:

> Mr. Bauza will not be allowed to withdraw. Although Mr. Cicilline has appeared stating that he is ready for trial on May 6[,] I am getting conflicting informal signals to the effect that he expects a continuance in this case. Motion denied until the trial gets underway.

The trial lasted for five days, from May 6 to May 10. During three of these days, Attorney Cicilline conducted the unrelated trial from 9 a.m. to 5 p.m.; he then tried Flecha–Maldonado's case from 5 p.m. to 9 p.m. The second and fifth days of trial were conducted during more typical hours.

A district court's denial of a continuance is reviewed under the deferential abuse of discretion standard. *United States v. Perez–Ruiz*, 353 F.3d 1, 8 (1st Cir.2003). Because "[t]rial management is peculiarly within the ken of the district court ... [o]nly 'an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay' constitutes an abuse of that discretion." *United States v. Saccoccia*, 58 F.3d 754, 770 (1st Cir.1995) (quoting *Morris v. Slappy*, 461 U.S. 1, 11–12, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983)).

Normally, one would expect a district court judge to grant a continuance of a trial in order to avoid an inadvertent scheduling conflict with another trial. In many cases, the resolution reached here— requiring counsel to keep a 9 a.m.–to–9 p.m. schedule while trying two different cases—would be inappropriate, for a number of obvious reasons. Such a schedule could threaten the adequacy of representation a criminal defendant receives. It could also impair the court's compliance with the ethical canon requiring a court to be "patient, dignified, respectful, and courteous to litigants, jurors, witnesses, [and] lawyers." [4] Judicial Canon 3(A)(3).

Here, however, the imposition of a 5 p.m.–to–9 p.m. schedule, after a 9 a.m.–to–5 p.m. schedule, was not an abuse of discretion for several reasons. First, trial counsel knowingly put himself in this situation by agreeing to try the unrelated case on May 6, even though he had already

---

3. Although Attorney Cicilline represents in his briefing and argument to this court that he made this motion, it was not recorded in the docket of the lower court. Whether by motion or informal communication, however, it seems clear that the attorney notified the judge of this issue, and the judge informed counsel that no continuance would be granted and that trial would be held from 5 p.m. to 9 p.m.

4. We note the trial judge himself had already worked at least a 9–to–5 day, and it appears the prosecutor in this trial was on the same schedule. *See* Judicial Canons 3A(3) & 3A(5); Commentary to Canon 3A(5). In disposing of matters promptly, efficiently, and fairly, a judge must demonstrate due regard for the parties' rights to be heard and to have issues resolved without unnecessary cost or delay.

represented to the judge in this case that he was ready and available for trial on that same date. When we asked counsel at oral argument why he had agreed to try both cases on the same day, he replied that he assumed the two judges would ascertain there was a scheduling conflict and work it out. We suspect trial counsel assumed one defendant or the other would plead out and the schedule conflict would disappear. Whatever the reason, the obligation was on counsel to resolve this conflict.

Second and more important, counsel has identified no concrete ways in which the unusual trial schedule in this case prejudiced Flecha–Maldonado. If the denial of the continuance had resulted in identifiable and meaningful harm to the defendant, the question of abuse of discretion would be different; prejudice to the defendant is always a factor. *See United States v. Moore*, 362 F.3d 129, 136 (1st Cir.2004) (denial of a continuance was not an abuse of discretion because the attorney, even though he did not expect to argue the case prior to the hearing, was "eloquent on his client's behalf" and could not identify any specific prejudice). But counsel has not pointed to any specific prejudice to Flecha–Maldonado that arose from his trying the case from 5 p.m. to 9 p.m. on several days.[5] In such circumstances, we cannot say there was an abuse of discretion. Nonetheless, we encourage the avoidance of situations in which counsel is directed to be in trial from 9:00 a.m. to 9:00 p.m., whatever the heavy caseload of a court and whatever the missteps of counsel.

**5.** Counsel did make one creditable argument of prejudice at oral argument relating not to the trial schedule but to the delayed production of transcripts. We address this issue below.

**6.** Attorney Cicilline eventually filed a motion with the court for the production of the transcripts on May 7, after the start of trial.

### 2. Delayed Production of English Language Transcript of Taped Spanish Conversations

Almost all of Flecha–Maldonado's criminal actions were captured on either video or audio tape, with the defendants speaking in Spanish. Months before trial, all of the audio recordings were given to then-counsel Bauzá–Torres. No transcripts of the conversations on these tapes, either in Spanish or in English, were given to Attorney Bauzá–Torres.

After Attorney Cicilline, who does not speak Spanish, entered the case, he requested, by letter of April 24, 2002, that the government provide English transcripts of any audio recordings it intended to introduce at trial. He thereafter left a voice message with the prosecutor and sent a fax requesting the transcripts. The government acknowledges receiving the request for transcripts, for the first time, on May 2.[6] Prior to the start of the trial, the government turned over to defense counsel English transcripts of all but one of the tapes that it ultimately used at trial.[7] This tape contained the conversation that Flecha–Maldonado, Juma–Pineda, and Ortiz–Colón had in the car while they were making the delivery of the sham cocaine.

On the first day of trial, defense counsel again moved for a continuance, this time because he had not received the English translation of the tape. After the prosecution represented that the transcript was

**7.** In addition, there was a second tape that the prosecution initially intended to use at trial, but which it had not had translated or transcribed prior to trial. Defense counsel received the English translations of this tape at some point during trial, but the tape was ultimately never used by the government.

being worked on and was expected shortly, the court held that the trial would proceed as planned, but that the translation would need to be provided to defense counsel before the tape could be introduced in evidence.

After the second day of trial, the prosecution delivered the missing transcript to counsel. The transcript only identified the speakers generically (i.e., "male voice 1," etc.), but the prosecutor informed defense counsel of the speakers' identities at around 9 p.m. that evening.[8] At the start of the third day of trial, which was around 5 p.m. the next day, the prosecution introduced the tape in evidence and provided the jury with the transcripts. On the fourth day, defense counsel moved for a mistrial based on the late production of the translations. The district court denied the motion.

■ Flecha–Maldonado argues on appeal that the district court erred both in denying his motion for a continuance based on the late production of the transcripts and in denying his motion for a mistrial. He claims that he was prejudiced by the late production of the translations and points out that, given counsel's 9 a.m.–to–9 p.m. trial schedule, counsel had scant time to review the translation prior to its introduction in evidence. Flecha–Maldonado also argues that, as a result of the late production of the translated transcripts, he was unable to make an informed decision about whether to take advantage of the government's plea offer, which expired at the start of trial. Like review of the district court's refusal to grant a continuance, the denial of the motion for a mistrial is reviewed under the abuse of discretion standard. *United States v. Freeman*, 208 F.3d 332, 339 (1st Cir.2000). The abuse of

discretion, however, must be "manifest" in order to overturn the denial of a mistrial. *Id.*

It is clear that the government was required to enter in the record and provide the jury with the English transcripts of all of the tapes introduced in evidence at trial. *United States v. Morales–Madera*, 352 F.3d 1, 7–8 (1st Cir.2003). That was done here. The issue in this case concerns the prosecution's concomitant obligation to provide translated transcripts to counsel in adequate time before trial.

This problem arose because of the then-practice of the U.S. Attorney's Office in Puerto Rico of waiting to prepare English transcripts of taped evidence until it was certain that the transcripts would be needed at trial—a decision often made at the eve of trial. *See id.* at 10 n. 8. At times, this practice unfairly disadvantaged non-Spanish-speaking attorneys and resulted in inaccurate translations, failure to put English transcripts in the record, and sometimes the absence of any English transcripts altogether. *See id.* at 7–8. It consequently imposed considerable costs on defendants and the courts, leading to a series of decisions in this court. *See id.; United States v. Rivera–Rosario*, 300 F.3d 1 (1st Cir.2002). Among other things, these cases made clear that "[s]ound trial management and considerations of fairness caution that the government provide [English translations] to defense counsel adequately in advance." *Morales–Madera*, 352 F.3d at 8.

The U.S. Attorney's Office has represented to us that it has changed its practice and now requires that any recordings in Spanish be transcribed and translated at the indictment stage and given to de-

---

**8.** Although Attorney Cicilline said that he was not informed of the identities of the speakers until the following night, this is inconsistent with his statements to the judge at trial, which we credit.

fense counsel at or shortly after arraignment. We will hold the Office to that representation.

██ In this case, the district court did not abuse its discretion in denying either Flecha–Maldonado's motion for a mistrial or his second motion for a continuance. Even assuming *arguendo* that counsel for Flecha–Maldonado was unfairly caught by surprise at trial,[9] he has had nearly two years since the trial to reflect on what prejudice might have resulted from the late production of the translation. He has nonetheless failed to advance a single question he would have asked differently, objection he would have raised, or strategy that he would have pursued had he been given the English transcripts in a more timely fashion.

The one claim of prejudice that counsel has identified is that if he had been in possession of the translated transcript before trial, he would have advised Flecha–Maldonado to take advantage of the government's plea offer. According to Attorney Cicilline, the English transcript made him understand, in ways he did not from listening to a real-time translation, the strength of the government's case. Assuming dubitante that this is a cognizable claim of prejudice (though it does not go to Flecha–Maldonado's trial rights), it is insufficient to render the district court's denials of Flecha–Maldonado's motions for continuance and mistrial abuses of discretion. Although Attorney Cicilline may have advised Flecha–Maldonado to accept the plea offer had he fully comprehended the conversation on the tape,[10] Attorney Bauzá–Torres, who does speak Spanish and who was not permitted to withdraw from the case, had reviewed the tape with

Flecha–Maldonado months before trial. And Attorney Cicilline was certainly not completely ignorant of the tape's contents; he had been given the tape when he entered the case and had had it translated for him in real time by a Spanish speaker well before the start of trial.

Given counsel's inability to identify any specific prejudice to Flecha–Maldonado's rights, we have no reason not to credit the district court's conclusion that the midtrial production of the transcripts was inconsequential because the tape was "just frosting on the cake." The government's case was overwhelming even without the taped conversation at issue.

### 3. *Bad Act Evidence*

Flecha–Maldonado appeals the district court's admission in evidence of Ortiz–Colón's testimony that he had previously committed several criminal acts with Flecha–Maldonado, including breaking into a house. The admission of this testimony, argues Flecha–Maldonado, was impermissible under Fed.R.Evid. 404(b), which forbids the admission of evidence "of other crimes, wrongs or acts ... to prove the character of a person in order to show action in conformity therewith." Flecha–Maldonado objected on this basis both at trial and in a motion in limine, thereby preserving his objection, so our review is for abuse of discretion, *United States v. McCann*, 366 F.3d 46, 51 (1st Cir.2004).

██ The admission of this testimony was not an abuse of discretion. Evidence concerning former criminal acts does not violate Rule 404(b) if it is admitted for a purpose other than showing that the crimi-

---

9. Counsel acknowledged at oral argument that he had listened to the Spanish tapes much earlier and, assisted by a translator, had taken notes.

10. We do note that if counsel's argument has merit, the government could have avoided trial by providing the translation earlier.

nal charges are consistent with past criminal conduct or bad character. *See* Fed. R.Evid. 404(b); *United States v. Soto–Beniquez,* 356 F.3d 1, 38 (1st Cir.2004); *United States v. Escobar-de Jesus,* 187 F.3d 148, 169 (1st Cir.1999). Here, the testimony regarding prior criminal conduct was admissible because it explained why the government initially instructed Ortiz–Colón to contact Flecha–Maldonado and ask him to participate in the fabricated drug transport: Ortiz–Colón was only asked to contact individuals, especially police officers, with whom he had already committed criminal acts. *Cf. Escobar-de Jesus,* 187 F.3d at 169 (in conspiracy cases, evidence of prior bad acts can be admitted to show "the background, formation, and development of the illegal relationship").

For similar reasons, the admission of the testimony was not an abuse of discretion under Rule 403. The testimony was important background information that explained how the government came to suspect Flecha–Maldonado and why Flecha–Maldonado initially trusted Ortiz–Colón and was willing to participate in the criminal venture. And any unfair prejudice was mitigated by the fact that the district court limited the testimony of prior criminal activity to that context. The district court was entitled to conclude that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

#### 4. *Denial of Rule 29 Motion on Count Three*

Flecha–Maldonado argues that he was entitled to a judgment of acquittal on Count Three, the violation of 18 U.S.C. § 924(c)(1), because there was no evidence that he personally carried a firearm. The trial court rejected this argument under the rule of *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

was correct. The basic elements of a § 924(c)(1) violation are "(1) that the defendant committed the predicate drug trafficking crime ...; (2) that the defendant knowingly carried or used a firearm; and (3) that the defendant did so during and in relation to the specified predicate offense." *United States v. Figueroa–Encarnacion,* 343 F.3d 23, 30 (1st Cir.2003) (quoting *United States v. Currier,* 151 F.3d 39, 41 (1st Cir.1998)). We have repeatedly held that under *Pinkerton,* the defendant does not need to have carried the gun himself to be liable under § 924(c). *See, e.g., United States v. Collazo–Aponte,* 216 F.3d 163, 195–96 (1st Cir.2000), *vacated on other grounds,* 532 U.S. 1036, 121 S.Ct. 1996, 149 L.Ed.2d 1000 (2001); *United States v. Shea,* 150 F.3d 44, 50 (1st Cir.1998). So long as there is sufficient evidence that a co-conspirator carried or used a firearm in furtherance of the conspiracy and that this was reasonably foreseeable to the defendant, the defendant can be held liable as if he himself carried or used the firearm. *See Shea,* 150 F.3d at 50. Here, the district court was correct that there was ample evidence that Juma–Pineda knowingly carried a gun for the purpose of transporting the cocaine and that Flecha–Maldonado could be held liable for that activity.

### B. *Sentencing*

#### 1. *Abuse of a Position of Public Trust*

The court increased Flecha–Maldonado's base offense level by two points under U.S.S.G. § 3B1.3, which provides for such an enhancement "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." For the enhancement to apply, the govern-

ment must show by a preponderance of the evidence that the defendant (1) was in a position of public or private trust and (2) abused that trust in a manner that significantly facilitated the commission or concealment of the crime. *See United States v. Santiago–Gonzalez*, 66 F.3d 3, 8 (1st Cir.1995). Flecha–Maldonado contends that the court erred in applying the enhancement because there was insufficient evidence to satisfy either of these prongs. These claims are subject to a two-level review: we determine ourselves the legal meaning of the term "position of public . . . trust"; the remaining questions are fact-bound and reviewed for clear error. *See United States v. Tardiff*, 969 F.2d 1283, 1289 (1992).

First, in a variation on the Nuremberg defense, Flecha–Maldonado argues that he was not in a position of public trust because police officers simply follow orders and "ha[ve] little or no discretion in performing [their] duties." The application notes to the sentencing provision provide that a

> position of public or private trust [is] characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.

U.S.S.G. § 3B1.3 cmt. 1. This court has at least twice said that police officers do occupy a position of public trust within the meaning of the Guidelines because they exercise significant discretion. *United States v. Reccko*, 151 F.3d 29, 33 (1st Cir. 1998) ("Police officers regularly exercise significant discretion. . . ."); *United States v. Innamorati*, 996 F.2d 456, 490 (1st Cir. 1993) ("Employment as a registry police officer clearly qualifies as a 'position of

public . . . trust' within the meaning of the Guideline."). Flecha–Maldonado has said nothing to convince us that these decisions were in error.

Flecha–Maldonado also attacks the second prong of the sentencing enhancement, arguing that he did not wear a uniform or perform official duties while he committed the offense and thus that his position as an officer did not facilitate the crime. But the facts suggest otherwise. Flecha–Maldonado agreed to transport drugs for a purported drug dealer who desired a police escort to guarantee the success of the transaction. Although he was not in uniform, his two colleagues were and one of them was carrying a service gun. On that basis, there was no error, much less clear error, in applying the § 3B1.3 enhancement.

### 2. *Denial of Downward Departure*

During sentencing, Flecha–Maldonado sought a downward departure on the ground that he would be extremely vulnerable to abuse in prison as a former police officer. *See* U.S.S.G. § 5K2.0(a)(2); *Koon v. United States*, 518 U.S. 81, 111–12, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (recognizing susceptibility to abuse in prison as a potential ground for departure). The district court denied the motion, saying only "I am not prepared to grant a downward departure under th[e]se circumstances. Sorry." Flecha–Maldonado appeals because he interprets this statement as reflecting the court's belief that it lacked authority to grant such a departure. If so, appellate review is available. *See United States v. Teeter*, 257 F.3d 14, 30 (1st Cir. 2001). If, by contrast, the court understood that it had the authority to grant the departure but chose not to exercise that authority, then the decision is not reviewable on appeal. *Soto–Beniquez*, 356 F.3d at

54; *United States v. Rivera–Rodriguez,* 318 F.3d 268, 275 (1st Cir.2003).

The district court's decision not to depart downward here is non-reviewable. The court clearly signaled it understood its options in this case when it entertained Flecha–Maldonado's arguments as to whether he was susceptible to abuse in prison and then said that it would not grant a downward departure *under these circumstances.* The clear implication of the court's statement is that it knew it had the power to grant a departure and that, under other circumstances, it might have done so.

## III.

The conviction and sentence are *affirmed.* So ordered.