# United States Court of Appeals
## For the First Circuit

No. 02-2286
    02-2682

UNITED STATES OF AMERICA,

Appellee,

v.

JOSE SERRANO-BEAUVAIX; MAHMUD JUMA-PINEDA,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Torruella, Lynch, and Lipez, Circuit Judges.

Mark Diamond for appellant Jose Serrano-Beauvaix.
George J. West for appellant Mahmud Juma-Pineda.
Thomas F. Klumper, Assistant United States Attorney, with whom
H.S. Garcia, United States Attorney, and Nelson Pérez-Sosa,
Assistant United States Attorney, Senior Appellate Attorney, were
on brief, for appellee.

March 4, 2005

**LYNCH**, **Circuit Judge**. Jose Serrano-Beauvaix and Mahmud Juma-Pineda were participants in a large conspiracy which transported drugs under the protection of corrupt police officers in the Puerto Rico Police Department. The conspiracy is described in United States v. Flecha-Maldonado, 373 F.3d 170, 172-74 (1st Cir. 2004), upholding the conviction of one of Serrano's and Juma's co-conspirators.

In brief, Serrano, a former police officer who had been expelled from the force, helped to recruit Juma, a police officer at the time, to provide armed escort for a shipment of ten kilograms of cocaine in October, 2000. Juma rode with the drugs and carried a pistol. Serrano rode in another car and conducted counter-surveillance and advised his codefendants through cell phones. They each received a $5000 payment for their services in the crime.

Each defendant pled guilty to charges of conspiracy to distribute in excess of five kilograms of cocaine in violation of 21 U.S.C. §§ 841(a) and 846 (Count One), and of carrying firearms (and aiding and abetting of same) in furtherance of a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2 (Count Three). Each defendant stipulated to being personally responsible for one kilogram of cocaine. In the plea agreements, each also agreed to certain sentencing enhancements and

acknowledged that each did not qualify for safety-valve treatment under the Sentencing Guidelines.

Serrano was sentenced to 63 months' imprisonment for Count One and a consecutive term of 60 months for Count Three. Juma was sentenced to 60 months' imprisonment for Count One and a consecutive term of 60 months for Count Three.

Serrano appeals from his conviction for the firearms count, contending that his guilty plea was procedurally flawed under Fed. R. Crim. P. 11(b)(3).[1] We reject this argument because there was no error during the Rule 11 colloquy. Serrano and Juma both appeal their sentences, raising a variety of arguments, most of which were waived by their plea agreements. Serrano also raises a claim of plain error as to his sentence under United States v. Booker, 543 U.S. __, 125 S. Ct. 738 (2005). We reject this argument as well because Serrano has failed to carry his burden that there is a "reasonable probability" that he would be sentenced more leniently under an advisory Guidelines system. See United States v. Antonakopoulos, No. 03-1384, 2005 WL 407365, at *4 (1st Cir. Feb. 22, 2005).

---

[1]Rule 11(b)(3) resulted from the recodification of its predecessor, Rule 11(f), in December of 2002. See United States v. Ventura-Cruel, 356 F.3d 55, 60 n.5 (1st Cir. 2003). However, the change in language between Rule 11(b)(3) and Rule 11(f) is only stylistic. Id.

A.  Serrano's Appeal

   1. The Guilty Plea To Count Three

        Serrano argues for the first time on appeal that the district court erred procedurally in accepting his guilty plea to Count Three.  His argument is that the district court failed to "explore the factual basis of the guilty plea" as required by Fed. R. Crim. P. 11(b)(3), which states: "Before entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea."  Serrano argues that had the district court done so, it would have found that there was no factual basis for Serrano's guilty plea because Serrano only admitted to providing "armed transport" for the drug shipment, but not to having possessed a firearm.  The admission that he was "armed" was insufficient, he now argues, because it might have meant that he was "armed with a big stick."

        We review a Rule 11 challenge raised for the first time on appeal only for plain error.  United States v. Vonn, 535 U.S. 55, 74-76 (2002); United States v. Cheal, 389 F.3d  35, 40 (1st Cir. 2004); see also United States v. Mills, 329 F.3d 24, 27 (1st Cir. 2003) ("An error not objected to at the plea hearing is reversible only where the error is plain, affects the defendant's substantial rights, and seriously affects the fairness of the proceeding.").  As to the underlying issue of compliance with the

Rule, "[o]n a plea, the question under Rule 11(f) [now Rule 11(b)(3)] is not whether a jury would, or even would be likely, to convict: it is whether there is enough evidence so that the plea has a rational basis in facts that the defendant concedes or that the government proffers as supported by credible evidence." United States v. Gandia-Maysonet, 227 F.3d 1, 6 (1st Cir. 2000). In this case, there was no error.

Serrano's argument mischaracterizes his plea colloquy by ignoring the aiding and abetting and in furtherance of the conspiracy aspects of the charge against him in Count Three. The district court's Rule 11 colloquy focused on those aspects of the charge. It is irrelevant whether there were facts to show that Serrano was personally armed with a gun or a big stick. During the Rule 11 colloquy, Serrano specifically agreed that in "aiding and abetting each other a gun was possessed in furtherance of the conspiracy" (emphasis added). Furthermore, Serrano's counsel explained that Serrano understood that although he "did not carry the firearm" (emphasis added), he was responsible for the firearm(s) carried by his codefendant(s) under Pinkerton v. United States, 328 U.S. 640 (1946). Rule 11(b)(3) is meant to "protect a defendant who is in the position of pleading voluntarily with an understanding of the nature of the charge but without realizing that his conduct does not actually fall within the charge." McCarthy v. United States, 394 U.S. 459, 467 (1969) (footnote and

internal quotation marks omitted). The district judge ascertained that Serrano understood that he could be held liable for the firearms charge without having carried the gun himself and that Serrano was aware of the gun Juma possessed as part of the "armed escort" they provided for the drug shipment.

### 2. The Sentence for Count One

Serrano brings a trio of challenges to his sentence as to Count One,[2] and argues that we should remand to the district court for resentencing in light of United States v. Booker, 543 U.S. __, 125 S. Ct. 738 (2005). First, he challenges the evidentiary support for his criminal record and his organizer role sentencing enhancement; second, he argues that the district court was constrained by the mandatory Sentencing Guidelines and so sentenced him to above the statutory minimum; third, he argues that he should have been given the benefit of the safety valve. We take up each challenge in turn.

---

[2]Serrano's sentence was computed as follows: The stipulated drug amount established a base offense level of 26. U.S.S.G. § 2D1.1(c)(7). This base offense level was enhanced by two levels because of his role as an "organizer, leader, manager, or supervisor" and reduced by three levels because of his acceptance of responsibility, yielding a final offense level of 25. See U.S.S.G. §§ 3B1.1(c), 3E1.1(a)-(b). The base offense level and the enhancement calculations were all made a part of the plea agreement signed by the defendant. His criminal history score was 3, which placed him in criminal history category II. The Guidelines range was therefore 63-78 months. U.S.S.G. Ch. 5 Pt. A. The statutory minimum under 21 U.S.C. § 841(b)(1)(B) for the offense Serrano pled guilty to is 60 months.

i. We begin with Serrano's argument that there was no factual support for either the finding 1) that Serrano's role during the offense was that of an "organizer, leader, manager, or supervisor," justifying an increase in his offense level by two levels, see U.S.S.G. § 3B1.1(c), or 2) that Serrano's criminal history placed him in criminal history category II.[3] If the district court erred in making these findings and, as a result, misapplied sentencing enhancements under the Guidelines so as to cause prejudice to Serrano's sentence, the errors would justify remand for resentencing even under pre-Booker circuit precedent. See, e.g., United States v. Thiongo, 344 F.3d 55, 63 (1st Cir. 2003); United States v. McMinn, 103 F.3d 216, 219 (1st Cir. 1997).

Serrano has waived his challenge to his organizer role enhancement. The plea agreement stipulated that Serrano "helped [another codefendant] contact and recruit a police officer to assist in the escort of the cocaine shipment." The plea agreement also included the stipulation that Serrano's offense level would be adjusted upwards by two levels under § 3B1.1 because he "recruited one of his co-defendants." The district judge ascertained that Serrano understood and agreed to this adjustment. At sentencing,

---

[3]Without the role-enhancement, Serrano's final offense level would have been 23, and combined with a criminal history category of II, would have produced a Guidelines sentencing range of 51-63 months. U.S.S.G. Ch. 5 Pt. A. Similarly, if Serrano's criminal history category had been I, that, combined with a final offense level of 25, would have produced a Guidelines range of 57-71 months. Id.

Serrano made no objection to the finding that he recruited a codefendant.

As for Serrano's criminal history, "[o]nce the government establishes the existence of a prior conviction, the burden shifts to the defendant to show that the earlier conviction was constitutionally infirm or otherwise inappropriate for consideration." United States v. Barbour, 393 F.3d 82, 93 (1st Cir. 2004). At Serrano's detention hearing, his counsel stipulated to a criminal conviction in Humacao for violating Puerto Rico weapons laws. Serrano's pre-sentencing report (PSR), "which can be used to satisfy the government's 'modest' burden," id. (quoting United States v. Gray, 177 F.3d 86, 89 (1st Cir. 1999)), detailed Serrano's prior conviction in commonwealth court in Humacao for violating Puerto Rico weapons laws and calculated his criminal history score to be 3. Serrano made no objection to his criminal history score in the PSR at his sentencing hearing. Serrano conceded that "the probation officer has to follow what convictions [Serrano] has in the police of Puerto Rico records." In fact, the only "correction" that Serrano's counsel wished to make to the PSR was to "reference . . . the actual number of the criminal case in Humacao," and the court agreed. Serrano admitted to this conviction at the sentencing hearing, but suggested as a "mitigating argument" that he had a "solid alibi defense." The district court properly rejected this argument.

ii.  Serrano next argues that his sentence on Count One should be vacated and the case remanded for resentencing because the district court was clearly constrained by the Guidelines during sentencing and imposed the 63-month term, which was above the statutory minimum of 60 months, and was at the bottom of the applicable Guidelines range.  Post Booker, Serrano argues, the district court could have (and would have) sentenced him to the statutory minimum of 60 months.  Serrano made no arguments in the district court questioning the constitutionality of the Guidelines or the application of the Guidelines to his sentence under Apprendi v. New Jersey, 520 U.S. 466 (2000), or Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004), so the Booker issue was not preserved.  See Antonakapolous, 2005 WL 407365, at *6.

We have recently set forth the applicable framework for review of unpreserved Booker claims in Antonakopoulos.  Utilizing the four-prong test in United States v. Olano, 507 U.S. 725 (1993), there must be (1) an error (2) that is plain, and it (3) affects substantial rights and (4) seriously impairs the fairness, integrity, or public reputation of judicial proceedings. Antonakopoulos, 2005 WL 407365, at *4.  The first two prongs of the plain error test are met whenever the district court treated the Guidelines as mandatory at the time of sentencing.  Id.  But to meet the third prong of the test, the defendant must persuade us that there is a "reasonable probability that the district court

-9-

would impose a different sentence more favorable to the defendant under the new 'advisory Guidelines' <u>Booker</u> regime." <u>Id.</u> "[I]t is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice under plain-error analysis." <u>Id.</u> at *6 (citations and internal quotation marks omitted).

Serrano relies upon the district judge's statement at the sentencing hearing: "I have to consider the fact that I cannot sentence him to 60 months. The lowest I can sentence him on that particular situation is 63." This statement, he argues, makes it "clear that the district court would have sentenced [Serrano] to 60 months in prison instead of 63 on count one." Not so. Given Serrano's criminal history category and his role as recruiter, and the amount of drugs involved, the court's statement was a simple statement of fact. The statutory minimum, without the enhancements, was 60 months. He was sentenced to 63 months, out of a possible range of 63 to 78 months. Serrano's argument amounts to an assertion that there was such a reasonable probability that the judge would have totally ignored Serrano's role in the offense and prior conviction and that our confidence in the outcome is undermined by the fact that the judge actually considered these two enhancements. Even post-<u>Booker</u>, the district court "must consult those Guidelines and take them into account when sentencing." <u>Booker</u>, 543 U.S. at __, 125 S. Ct. at 767. And so the court had to

consider both role in the offense and his criminal history. Serrano has failed to meet his burden.

iii. Serrano's final argument in his sentencing appeal is that the district court committed error in denying him the benefit of the provisions of the safety valve under 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2. The argument, raised for the first time on appeal, is that but for the court's findings that Serrano had more than one criminal history point and that Serrano was an organizer of the criminal activity, he would have qualified for safety-valve treatment and thus be entitled to sentencing without regard to any statutory minimum.

The effect of <u>Booker</u>, if any, on the safety valve has not been determined. See <u>Antonakopoulos</u>, 2005 WL 407365, at *6 n.6. But Serrano's argument is waived because Serrano explicitly agreed in his plea agreement that he did not qualify for safety-valve treatment, and confirmed that he understood that he did not qualify for the safety valve during his change of plea hearing.

B. <u>Juma's Appeal of His Sentence</u>

Juma first argues that the district court erred by equating his carrying of his official police pistol during the crime with disqualification from his entitlement to a downward departure under the safety valve. <u>See</u> 18 U.S.C. § 3553(f) and U.S.S.G. §§ 2D1.1(b)(7), 5C1.2. He argues that but for the finding

-11-

that he carried his pistol during and in connection with the crime, he would have qualified for safety-valve treatment and be sentenced below the statutory minimum. Although he stipulated to having "carried a pistol" during the escort in his plea agreement, Juma contends that the district court erred by not considering that he may nonetheless qualify for the safety valve because the firearm was not clearly connected to the offense.[4] See United States v. Bolka, 355 F.3d 909, 914 (6th Cir. 2004).

This argument is waived because Juma explicitly agreed in his plea agreement that he did not qualify for safety-valve treatment, and confirmed that he understood that he did not qualify for the safety valve during his change of plea hearing.

Juma's second argument is that a jury, not a judge, should have made the factual determinations underlying his disqualification for the safety valve and the abuse of public trust enhancement. By pleading guilty he waived consideration of the issues by a jury.

**III.**

Serrano's conviction and both defendants' sentences are **affirmed**.


**(Concurrence follows.)**

---

[4]During the drive to transport the drugs, Juma pulled out the gun to clean it in plain view. Flecha-Maldonado, 373 F.3d at 173.

**LIPEZ, Circuit Judge, with whom TORRUELLA, Circuit Judge, joins, concurring.** Recently, in United States v. Antonakopoulos, No. 03-1384, 2005 WL 407365 (1st Cir. Feb. 22, 2005), a panel of this court explained for the first time our standards for review of unpreserved claims of sentencing error in the aftermath of United States v. Booker, 543 U.S. __, 125 S. Ct. 738 (2005). That decision is binding on subsequent panels. Eulitt v. Me. Dep't of Educ., 386 F.3d 344, 349 (1st Cir. 2004) (in a multi-panel circuit, newly constituted panels are bound by prior panel decisions). I agree with the result of the application of Antonakopoulos to this case. I write separately, however, to explain why, if I were free to do so, I would take a different approach to reviewing unpreserved claims of Booker error.

Before explaining my differing views, however, I want to stress that I agree with much in Antonakopoulos. I agree with its description of Booker error as inhering in the mandatory nature of the sentencing guidelines, regardless of whether the sentence was premised on any judge-found facts. I agree, too, that the defendant has preserved a claim of Booker error if he argued below that his sentence violated Apprendi v. New Jersey, 530 U.S. 466 (2000), or Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004), or that the guidelines were unconstitutional. I agree that we should not remand cases automatically, either because a defendant's sentence was enhanced on the basis of judge-found facts

-13-

or because the sentence was imposed on the basis of mandatory guidelines.

My one disagreement with Antonakopoulos is crucial, however. I do not believe that we should require defendants invoking unpreserved Booker error to make a specific showing of prejudice (the reasonable probability of a different outcome) to satisfy the third step of plain-error review. Rather, such error should entitle the defendant to a presumption of prejudice, which the government can then try to rebut. This approach, adopted by a panel of the Sixth Circuit in United States v. Barnett, No. 04-5252, 2005 WL 357015 (6th Cir. Feb. 16, 2005), is well grounded in Supreme Court precedent and has been applied by our sister circuits in other contexts "where the inherent nature of the error made it exceptionally difficult for the defendant to demonstrate that the outcome of the lower court proceeding would have been different had the error not occurred." Id. at *9. I wish to explain further my reasons for preferring this approach.

## 1. The difficulty of reconstructing a hypothetical sentencing decision

Several courts of appeals considering unpreserved claims of Booker error have emphasized the difficulty of speculating about what a district-court judge would have done differently under an advisory guidelines regime. The Fourth Circuit admitted that: "We simply do not know how the district court would have sentenced Hughes had it been operating under the regime established by

-14-

Booker." United States v. Hughes, 396 F.3d 374, 381 n.8 (4th Cir. 2005). Similarly, the Sixth Circuit wrote that "even if we conclude that the evidence is 'overwhelming and essentially uncontroverted' we cannot know the length of imprisonment that the district court judge would have imposed pursuant to this evidence following Booker." United States v. Oliver, No. 03-2126, 2005 WL 233779, at *8 n.3 (6th Cir. Feb. 2, 2005) (quoting United States v Cotton, 535 U.S. 625, 633 (2002)). The Eleventh Circuit, too, after wondering what the district court might have done differently, answered its own question:

> The obvious answer is that we don't know. If the district court judge in this case had the liberty of increasing or decreasing Rodriguez's sentence above or below the guidelines range, he might have given Rodriguez a longer sentence, or he might have given a shorter sentence, or he might have given the same sentence. The record provides no reason to believe any result is more likely than the other. We just don't know.

United States v. Rodriguez, No. 04-12676, 2005 WL 272952, at *9 (11th Cir. 2005).

Indeed, the Second Circuit found this problem so vexing that it chose to ask the district courts directly whether, in their judgment, "a nontrivially different sentence would have been imposed" under advisory guidelines. United States v. Crosby, No. 03-1675, 2005 WL 240916, at *12 (2d Cir. Feb. 2, 2005). The Second Circuit noted that

> in many cases, it will be impossible to tell whether the judge would have imposed the same sentence had the judge not felt compelled to impose a Guidelines sentence. It

-15-

> will also be impossible to tell what considerations counsel for both sides might have brought to the sentencing judge's attention had they known that they could urge the judge to impose a non-Guidelines sentence.

Id. at *9.  The court chose to solve the problem by remanding any case with unpreserved Booker error to the district courts, which would then decide if resentencing was required.  Although I do not favor the Second Circuit's remand approach, I understand the concerns that motivated it.  So, too, did a panel of the Sixth Circuit in the Barnett decision.

### 2. **Barnett and presumed prejudice in Olano**

In Barnett, the court emphasized the difficulty faced by defendants trying to demonstrate the prejudice that resulted from the district court's application of mandatory guidelines, when "well established case law substantially undermined any need or incentive for sentencing courts pre-Booker to note their objections and reservations in sentencing defendants under the then-mandatory Guidelines."  2005 WL 357015, at *4.  Consequently,

> [i]t would be improper for this Court now to require defendants such as Barnett to produce this type of evidence--that sentencing courts had no reason to provide under our pre-Booker case law--in order to establish that their substantial rights have been affected. . . . Instead of speculating as to the district court's intentions in the pre-Booker world, and trying to apply those intentions to predict the same court's sentence under the post-Booker scheme, we are convinced that the most prudent course of action in this case is to presume prejudice. . . .

Id.

-16-

Barnett reads United States v. Olano, 507 U.S. 725 (1993), as suggesting that if a defendant would have extraordinary difficulty making a specific showing of prejudice, then a presumption of prejudice may be appropriate. Barnett, 2005 WL 357015, at *9. The government, of course, can try to rebut that presumption. Id. at *12. The dissent in Barnett maintains, however, that "the Supreme Court has never put its imprimatur on the idea that we may presume prejudice in plain error review," id. at *18. It supported that assertion by observing that Olano devotes just a sentence to the issue and then refused to consider it further.

That is not a fair reading of Olano. After first positing a category of plain errors entitled to a presumption of prejudice, the Court found no reason to place the specific plain error cited by the defendant (the presence of alternate jurors during jury deliberations) in that category. 507 U.S. at 735. True, the Court declined to offer a strict definition of the category, seeing no need to "address those errors that should be presumed prejudicial if the defendant cannot make a specific showing of prejudice." Id. Later, however, the Court did confront the question of whether Olano's error would belong to such a category, if it exists; it decided that "we see no reason to presume prejudice here." Id. at 737. At the same time, the Court allowed that "[t]here may be cases where an intrusion should be

-17-

presumed prejudicial." Id. at 739.  In fact, the Court framed the basic inquiry of its decision as: "The question, then, is whether the instant violation of Rule 24(c) prejudiced respondents, either specifically or presumptively." Id. (emphasis added).  Ultimately, the Court did not think "that the mere presence of alternate jurors entailed a sufficient risk of 'chill' to justify a presumption of prejudice on that score." Id. at 741.  Nevertheless, its analysis forthrightly explored the possibility that some kinds of errors would justify such a presumption.

Here, in appeals with unpreserved claims of Booker error, we have been presented with such errors.[1]

### 3. Presumed prejudice in other contexts

Courts have presumed prejudice for errors that, by their very nature, make a demonstration of prejudice exceptionally difficult.  The Sixth Circuit has presumed prejudice where alternate jurors actually participated in the jury's deliberations (unlike Olano, where they were merely present).  See Manning v. Huffman, 269 F.3d 720, 726 (6th Cir. 2001) ("[T]he Olano court made it quite clear that in some situations a presumption of prejudice is appropriate.").  After all, there are "strict evidentiary prohibitions against inquiring into the mental processes of the

---

[1] I do not consider this approach foreclosed by Justice Breyer's closing words commending to the courts of appeal "ordinary prudential doctrines," like plain error.  Booker, 125 S. Ct. at 769.  Olano discussed presumption of prejudice in the context of plain-error review.

-18-

jury [that] would make it almost impossible for a defendant to show that an alternate juror in fact prejudiced his case."  Id. at 725 n.2.  In Booker cases, defendants face similarly forbidding speculation about the mental processes of a district-court judge if given the opportunity to apply advisory sentencing guidelines.

Courts have presumed prejudice where the defendant has been denied his right to allocution, that is, his opportunity to present mitigating circumstances to the court before being sentenced.  In those cases, too, courts have presumed that the defendant was prejudiced because of the extraordinary difficulty in discerning the error's prejudicial effect.  See United States v. Reyna, 358 F.3d 344, 352-53 (5th Cir. 2004) (en banc), cert. denied, 124 S. Ct. 2390 (2004).  The Fifth Circuit noted that this approach "avoids speculation as to what the defendant might have said or argued to mitigate his sentence."  Id. at 352.  In United States v. Adams, 252 F.3d 276 (3d Cir. 2001), the Third Circuit stated that showing prejudice

> would be an onerous burden for Adams [i.e., the defendant] to meet. In order to prove that the error actually "affected the outcome of the district court proceedings," Adams would have to point to statements that he would have made at sentencing, and somehow show that these statements would have changed the sentence imposed by the District Court. . . .  But as the Supreme Court explained in Olano, there may be some errors "that should be presumed prejudicial if the defendant cannot make a specific showing of prejudice." Olano, 507 U.S. at 735.  Thus the question for us becomes: should we presume prejudice when a district court violates a defendant's right of allocution?

-19-

252 F.3d at 287.  The Third Circuit's answer was yes.[2]  In <u>United States</u> v. <u>Alba Pagan</u>, 33 F.3d 125 (1st Cir. 1994), although we did not explicitly use <u>Olano</u>'s four-part test, we observed that relieving a defendant of his burden to show prejudice can compensate for cases where it would be extraordinarily difficult for the defendant to do so.  Consequently, we wrote that the denial of right to allocution "ordinarily requires vacation of the sentence imposed without a concomitant inquiry into prejudice.  This is so precisely because the impact of the omission on a discretionary decision is usually enormously difficult to ascertain."  <u>Id.</u> at 130.

### 4. Other reasons for presuming prejudice

In addition to the difficulty of reconstructing a hypothetical sentencing-court decision, there are three other reasons that make the presumption of prejudice a sensible choice for addressing unpreserved <u>Booker</u> error.

---

[2]  The Third Circuit has also presumed prejudice after a constructive amendment of the indictment:

> Similar to the plight of a defendant who is denied the right of allocution, it is very difficult for a defendant to prove prejudice resulting from most constructive amendments to an indictment. . . .  Therefore, we will apply in the plain error context a rebuttable presumption that constructive amendments are prejudicial (and thus that they satisfy the third prong of plain error review).

<u>United States</u> v. <u>Syme</u>, 276 F.3d 131, 154 (3d Cir. 2002).

-20-

### a. Difficulty of anticipating the error

Although some defendants preserved their claims of Booker error in the way described in <u>Antonakopoulos</u>,[3] others did not. Perhaps they can be faulted for not doing what other defendants did. Yet the fact remains that the status of the Guidelines was uncertain until <u>Booker</u> was decided, and the adoption of the remedy chosen in <u>Booker</u> for the Sixth Amendment violation (converting the Guidelines from mandatory to advisory) surprised many in the legal profession. Placing the burden on defendants to establish prejudice for unpreserved errors ordinarily makes sense because they ignored existing law that they could have invoked to avoid the error. As the Supreme Court has explained, the "burden should not be too easy" because the prejudice standard helps "to encourage timely objections and reduce wasteful reversals by demanding strenuous exertion to get relief for unpreserved error." <u>United States</u> v. <u>Dominguez Benitez</u>, 542 U.S. __, 124 S. Ct. 2333, 2340 (2004).

Here, however, the "existing" law (the availability of advisory guidelines) is an artifice of our rule that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases . . . pending on direct review . . .,

---

[3] "The argument that a <u>Booker</u> error occurred is preserved if the defendant below argued <u>Apprendi</u> or <u>Blakely</u> error or that the Guidelines were unconstitutional." <u>Antonakopoulos</u>, 2005 WL 407365, at *6.

with no exception for cases in which the new rule constitutes a 'clear break' with the past." Griffith v. Kentucky, 479 U.S. 314, 328 (1987); see also Johnson v. United States, 520 U.S. 461, 467 (1997).  In actuality, a demand by defendants pre-Booker that district-court judges treat the guidelines as advisory would have been rejected by most of them as an incorrect statement of the law. Frankly, "it seems unfair to fault [the defendant] for failing to raise at [sentencing] an objection based upon a rule that was not announced until after the [sentencing] was concluded."  United States v. Barone, 114 F.3d 1284, 1294 (1st Cir. 1997) (citing United States v. Collins, 60 F.3d 4, 7 (1st Cir. 1995)).

Perhaps defendants should be grateful that our rule of retroactivity for cases pending on direct review allows any possibility at all for resentencing.  But the fact remains that a greater willingness to acknowledge the likelihood of prejudice from a dramatic change in the law like Booker does not reward "sandbaggers" who hoard their objections to hedge against a result not to their liking.  There was no game-playing with a rule of law not yet known.[4]

---

[4] The Second Circuit has relied on an intervening change in law to justify shifting the prejudice burden from the defendant to the government: "In this Circuit, when the error results from an intervening change in the law, we have applied a modified version of the plain error doctrine whereby the burden is on the Government to show that the error did not affect substantial rights."  United States v. Williams , No. 04-2882, 2005 WL 425212, at *5 n.7 (2d Cir. Feb. 4, 2005); see also United States v. Viola, 35 F.3d 37, 41-42 (2d Cir. 1994), abrogated on other grounds by Salinas v.

-22-

b. <u>Adminstrative burden</u>

The administrative burdens of increased remands for sentencing (a likely result of the presumption of prejudice approach), while not insubstantial, would certainly be manageable, given the limited universe of cases at issue and the relatively low cost of correcting errors in sentencing. For example, the Second Circuit estimated that, when <u>Booker</u> was decided, it had about 200 cases pending on direct review with sentences that might be erroneous under the Supreme Court's new teaching:

> Many of these will likely be remanded . . . . Some of the remands will likely result in resentencing. We do not regard that prospect as an undue burden on the proper functioning of the criminal justice system in the federal courts of this Circuit. On the contrary, we consider it far preferable to leaving some materially erroneous

_____

<u>United States</u>, 522 U.S. 52 (1997). At the same time, the Second Circuit has wondered whether that so-called "modified version" has been implicitly rejected by <u>Johnson</u> v. <u>United States</u>, 520 U.S. 461 (1997). <u>See</u> <u>Williams</u>, 2005 WL 425212, at *5 n.7; <u>United States</u> v. <u>Thomas</u>, 274 F.3d 655, 688 n. 15 (2d Cir. 2001) (en banc).

Although I respect the Second Circuit's prudence, I find its speculation puzzling. In <u>Johnson</u>, the district court had decided for itself the issue of materiality in a perjury persecution, instead of submitting it to the jury. After Johnson was convicted, and before her appeal, the Supreme Court decided <u>United States</u> v. <u>Gaudin</u>, 515 U.S. 506 (1995), which required materiality to be submitted to the jury. The Supreme Court held that an appellate court can correct an error that was not plain at trial, but became so on appeal. <u>Johnson</u> confined its discussion of prejudice to addressing petitioner's theory that her error should be considered structural error and hence outside the ambit of Rule 52(b) altogether. The Court was dubious. Ultimately, the Court did not need to decide the issue because her case failed anyway at the fourth step of the plain-error analysis because of the overwhelming evidence of materiality. <u>Johnson</u>, 520 U.S. at 470. The issue of presumed prejudice--whether justified by a change in law or by other reasons--was simply not before the Court.

-23-

sentences in place simply because we cannot guess what sentencing judges would have done.

United States v. Williams, No. 04-2882, 2005 WL 425212, at *8 (2d Cir. Feb. 4, 2005). These cases are a closed set. As soon as the Supreme Court issued its opinion in Booker, district courts knew to stop sentencing defendants under mandatory guidelines, thus ensuring that no more cases will be tainted with Booker error.

Besides the simple numbers involved, we must consider that resentencing in cases still pending on direct review does not undermine the judicial system's high stakes in finality. By definition, the cases we address here are not final. Moreover, resentencing does not pose the burden of a new trial, with its considerable costs in time, money, and other resources. As the Second Circuit observed in Williams, "the cost of correcting a sentencing error is far less than the cost of a retrial. A resentencing is a brief event, normally taking less than a day and requiring the attendance of only the defendant, counsel, and court personnel." Williams, 2005 WL 425212, at *8. Given what is at stake in sentencing decisions--the potential for additional months or even years in prison--I believe that the increased administrative burdens are a tolerable price to pay.

c. Possibility of rebuttal

A presumption of prejudice still permits rebuttal by the government, as Barnett acknowledges. 2005 WL 357015, at *12. Thus, there would be no automatic remands, whether based on the

-24-

presence of judge-found facts and the use of mandatory guidelines or on the simple fact that mandatory guidelines were used as the basis for sentencing after a jury's findings or a defendant's admissions. Similarly, this approach also avoids treating <u>Booker</u> error as a structural error that "undermin[es] the fairness of a criminal proceeding as a whole." <u>Dominguez Benitez</u>, 124 S. Ct. at 2339; <u>see</u> <u>also</u> <u>Olano</u>, 507 U.S. at 735; <u>Arizona</u> v. <u>Fulminante</u>, 499 U.S. 279, 309-10 (1991) (providing examples of structural error). As in cases of preserved error that we review for harmlessness, the government will be able to argue the absence of prejudice based on the entirety of the existing record.

Indeed, this case provides an apt example of that prospect. Here, Serrano faced a statutory mandatory minimum of 60 months' imprisonment. After taking into account his role in the offense and his criminal history, the guidelines required (now, advise) a sentence within the range of 63 to 78 months, leaving little room for modification between the mandatory minimum of the statute and the guidelines minimum. The judge sentenced Serrano to 63 months. Even now, the district court "must consult those Guidelines and take them into account when sentencing." <u>Booker</u>, 125 S. Ct. at 767. The court could have sentenced him below the 63 months of the guidelines only by totally ignoring the sentencing factors that it is still required to consider. Thus, the

government could show that Serrano was not harmed by the mandatory nature of the guidelines.

### 5. Conclusion

Applying a presumption of prejudice in cases of <u>Booker</u> error would not be an innovation.  As <u>Barnett</u> explains, the concept is well grounded in <u>Olano</u> and other circuit decisions in a variety of contexts.  Hence, this approach remains faithful to <u>Booker</u>'s directive to the appellate courts to review unpreserved claims for plain error; it avoids automatic remands; and it responds fairly to the unique problems left in <u>Booker</u>'s wake.