**UNITED STATES of America, Appellee,**

**v.**

**Manuel GERONIMO, Defendant, Appellant.**

**No. 01–1668.**

United States Court of Appeals, First Circuit.

Heard Dec. 2, 2002.

Decided June 3, 2003.

Rehearing and Suggestion for Rehearing En Banc Denied July 3, 2003.

Janet H. Pumphrey, with whom Manuel Geronimo, pro se, was on brief for appellant.

Robert L. Peabody, Assistant United States attorney, with whom Michael J. Sullivan, United States attorney, was on brief for appellee.

Before LYNCH, LIPEZ, and HOWARD, Circuit Judges.

LIPEZ, Circuit Judge.

On January 12, 2000, a grand jury indicted defendant Manuel Geronimo on one count of conspiracy to import "ecstacy" (3,4 Methylenedioxymethamphetamine) and one count of aiding and abetting the importation of ecstacy. After a six-day trial, the jury acquitted Geronimo of the conspiracy charge, but found him guilty of aiding and abetting. *See* 21 U.S.C. § 952(a) (2003). The district court subsequently sentenced the defendant to a 78–month prison term. On appeal, Geronimo challenges the conviction on three grounds: 1) the government failed to prove the element of scienter required to convict on a drug importation charge, 2) the district court inadequately instructed the jury on aiding and abetting; and 3) the district court erroneously applied Federal Rule of Evidence 801(d)(2)(E) to admit the out-of-court statements of co-conspirators. Because, as the defendant concedes, these arguments were not properly preserved below, all three claims are subject to plain error review. After careful consideration, we affirm the defendant's conviction.

## I.

The material facts are generally undisputed. On December 2, 1999, United States customs inspectors intercepted airline passenger Disenia Gonzalez as she deplaned at Logan International Airport in Boston, Massachusetts. Airline manifests indicated that Gonzalez was a citizen of the Netherlands and that her flight to Boston had originated in Brussels, Belgium. In the experience of the customs officials at Logan Airport, Gonzalez's citizenship and route were typical of couriers attempting to smuggle drugs into the country. Their suspicions aroused, customs officials escorted Gonzalez to the customs examination area, where she was interviewed and searched. Gonzalez was wearing several layers of clothing concealing a bulky vest with eight velcro pockets. In each pocket of the vest agents discovered a cylindrical tube filled with white pills. In total, Gonzalez was carrying 10,436 pills weighing a total of 2,975 grams. Chemical tests conducted on the pills confirmed that they were ecstacy. During the search, agents also uncovered a Customs Declaration Form listing Gonzalez's destination as "Hotel Deytin in Saugus," and retrieved a slip of paper with an international phone number from Gonzalez's purse.

After Gonzalez was arrested and charged with importation of ecstacy and conspiracy to import ecstacy, she agreed to cooperate with the government. Gonzalez worked with Special Agent Tim McGrath, the customs official leading the investigation, to set up a "controlled delivery" of the ecstacy pills. After determining that no "Hotel Deytin" existed in Saugus, Massachusetts, he brought Gonzalez to the Days Inn in Saugus, the location that in his judgment most closely resembled (in name, location and type) the rendezvous point specified in Gonzalez's instructions. From the Days Inn, Gonzalez placed a call to the phone number earlier found in her personal effects, which belonged to an individual in Amsterdam named "Nilvio." She left a message on Nilvio's voice mail announcing her arrival and providing her current location. At 10:00 a.m. on December 3, an individual named Octavio Garcia arrived at the Days Inn and attempted to retrieve the drugs. Garcia was placed under arrest, and he too agreed to cooperate with the investigation.

Special Agent McGrath, with Garcia's help, arranged for a second controlled delivery. Over the next two hours, Garcia received nine telephone calls—three from Nilvio and six from the defendant. At 3:00 p.m., Geronimo arrived at the Days Inn to complete the transaction. After entering the hotel room, he placed $6,000 in cash on the bed and attempted to leave with a suitcase containing the ecstacy pills. This encounter, which was monitored and recorded by federal agents, was the source of some dispute at trial. The government argued that Geronimo, who was conversing with Garcia in Spanish, asked Garcia to carry the suitcase downstairs himself. The defense produced an interpreter who offered a different translation of the remarks in question. Neither party disputes that Geronimo ultimately picked up the suitcase and tried to leave the hotel room, at which point he was arrested.

In an effort to uncover the next link in the chain, Agent McGrath solicited from Geronimo the kind of cooperation he had received from Gonzalez and Garcia. Although Geronimo signed a waiver of his Miranda rights and initially appeared willing to cooperate, he requested a lawyer soon thereafter when Agent McGrath refused to promise the defendant that his cooperation would keep him out of prison. Geronimo ultimately failed to reach any plea agreement with prosecutors and his case went to trial.

At trial, the government elicited testimony from Gonzalez and Garcia that painted a more complete picture of the conspiracy. Gonzalez testified that Nilvio, a citizen of the Dominican Republic residing in Holland, originally supplied the ecstacy and offered to pay her $6,500 to smuggle the pills into the United States. Nilvio gave Gonzalez his phone number and informed her that a friend of his, "Machito," would meet her flight at Logan Airport. "Machi-

to" turned out to be Octavio Garcia, who was also a citizen of the Dominican Republic and an acquaintance of Nilvio's from Amsterdam. Garcia testified that in December of 1999, he was residing in Florida on a travel visa when Nilvio contacted him offering $2,000 if he would fly to Boston, retrieve the ecstacy from Gonzalez, and arrange delivery of the pills to Geronimo. Nilvio provided Garcia with Geronimo's beeper and phone number; two cards with these handwritten phone numbers were ultimately recovered from Garcia's effects when the police placed him under arrest. At trial, Garcia related the substance of numerous phone conversations with Geronimo in which he conveyed his travel plans, confirmed his arrival in Boston, arranged a preliminary meeting at a restaurant in Lawrence, Massachusetts, and set up the final controlled delivery at the Days Inn.

The defense did not attempt to contradict the testimony of the two cooperating witnesses. Instead, they sought to portray Geronimo as a "dupe" who believed that he was picking up a delivery of vitamins as a favor for a local businessman. Specifically, Geronimo testified that in November 1999 he was approached by a man named José Ortiz, who described himself as an entrepreneur attempting to establish a business in Lawrence supplying vitamins and proteins to local gyms and health stores. According to the defendant, Ortiz informed him that he was planning to be out-of-town for the next several days and asked Geronimo whether he could pick up a shipment of vitamins that would be arriving in Lawrence the next day. The defendant agreed, and Ortiz gave him $6,000 in cash, a telephone number, and a nickname, "MDMA," to use when contacting Ortiz at that number. Geronimo testified that Ortiz did not offer to pay him for picking up the vitamins, but that he was nonetheless willing to do it as a favor in the hopes that Ortiz might consider hiring him to work

for his Lawrence business. Special Agent McGrath had earlier testified that Geronimo, before requesting a lawyer, confessed to knowing that ecstacy was the subject matter of the transaction. Geronimo concluded his direct examination by vigorously disputing that he made any such admission.

At the close of the evidence, the judge provided the following instruction to the jury on the aiding and abetting charge:

To 'aid and abet' means to intentionally help someone else commit a crime. To establish aiding and abetting, the government must prove beyond a reasonable doubt (1) that another person or persons committed the crime charged; and, (2) that the defendant willfully associated himself in some way with the crime and participated in it as he would in something that he wished to bring about. That means that the government must prove that the defendant consciously shared the other person's knowledge of the underlying criminal act and intended to help him or her carry it out. He need not perform the underlying criminal act, be present when it's performed, or be aware of the details of its execution to be guilty of aiding and abetting. A general suspicion that an unlawful act may occur or that something criminal is happening is not enough. Mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish aiding and abetting.

Neither party objected to this instruction, and the jury retired to deliberate the case. After deliberating for approximately half a day, the jury submitted three questions to the court:

(1) Under "importation," we have the phrase "caused to be brought." To be considered part of the conspiracy … must the defendant know that the conspiracy involved importation?

(2) If the defendant knew he was picking up an illegal substance, but did not know [its] origin, can the defendant still be considered part of the conspiracy?

(3) The verdict sheet for Count 2 says "illegal importation" and not aiding and abetting. Why?

Responding to the first question, the court informed the jury that the defendant must have known that the conspiracy involved importation to be found guilty on the conspiracy charge. The court then gave a qualified affirmative response to the second question:

The answer to that question is also yes with this caveat: The defendant, as I explained, as part of a conspiracy need not know all of its details, but he must know its general objective. The defendant, to be part of a conspiracy under your second question, would not have to know that the drugs originated in Holland but would have to know that they originated somewhere outside of the United States and, consistent with the purpose of the conspiracy, were being, thus, brought into the United States.

In response to the third question, the judge discussed the legal significance of aiding and abetting, explaining that a person with knowledge of a crime and the purpose to carry it out is just as culpable under the law as the principal actor. Later that day the jury concluded its deliberations, finding Geronimo not guilty of the conspiracy charge, but convicting on the aiding and abetting count. The district court entered judgment on the verdict, and Geronimo filed a timely appeal.

## II.

### A. Scienter

■ The jury's questions to the court suggested that Geronimo's knowledge of

the importation element of the drug conspiracy was the weak link in the government's case. Having overlooked the knowledge of importation element at trial, Geronimo belatedly attempts to litigate the issue on appeal, claiming that the government failed to produce evidence that Geronimo knew the ecstacy had originated outside the United States. While Geronimo contested the sufficiency of the evidence in his Rule 29 motion for acquittal after the government's case in chief, the record does not indicate that he specifically challenged the government's proof of scienter. Moreover, the defendant failed to renew the Rule 29 motion at the close of his own case. "Absent a renewal of the motion for acquittal after presenting the case for the defense, the motion for acquittal is considered waived. Hence, in order to prevail on a challenge to the sufficiency of the evidence, the defendants must then demonstrate clear and gross injustice." *United States v. Stein,* 233 F.3d 6, 20 (1st Cir.2000).

The essence of the defendant's sufficiency of the evidence claim is that the government failed to demonstrate Geronimo's intent to further a drug importation scheme: "There was no evidence that Geronimo associated himself with importation, no evidence that he knew anything about the importation scheme, no evidence that he participated in the importation as something he wished to bring about, and no evidence that he took any action to make the importation succeed." The government argues in response that there is no scienter requirement regarding the fact of importation itself:

> Given that the government does not need to prove that the principal knew he

was importing drugs into the country, it should not need to prove that "element" for an aider and abettor. Rather, to establish a defendant's guilt under an aider and abettor theory, this Court's case law would seem to require that the government prove only that the principal imported a drug, and that the defendant knowingly aided in that importation, even if he did not know that the drugs had come from outside the country.

■ This characterization of the law ignores the plain language of the drug importation statute. 21 U.S.C. § 952 provides that, except to the extent that the Attorney General of the United States may permit for medical, scientific, or other legitimate purposes, "[i]t shall be unlawful ... to import into the United States from any place outside thereof, any controlled substance." 21 U.S.C. § 952(a). Significantly, section 960(a)(1) specifies that "[a]ny person who ... contrary to section 952, 953, or 957 of this title, *knowingly* or *intentionally* imports or exports a controlled substance ... shall be punished as provided in subsection (b) of this section." 21 U.S.C. § 960(a)(1) (emphasis added). Accordingly, to convict a principal actor of importing a controlled substance, the prosecution must prove that the accused knew the drugs were imported.[1] *See United States v. Bolinger,* 796 F.2d 1394, 1405, *as modified at* 837 F.2d 436 (11th Cir.1986), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1737, 100 L.Ed.2d 200 (1988).

Our decision in *United States v. Mejia–Lozano,* 829 F.2d 268 (1st Cir.1987), relied upon by the government, is not to the contrary. In that case, the defendant boarded an airplane in Bogota, Colombia

---

1. The term "import" is defined in the statute as "any bringing in or introduction of [an] article into any area (whether or not such bringing in or introduction constitutes an im-

portation within the meaning of the tariff laws of the United States)." 21 U.S.C. § 951(a)(1).

bound for Geneva, Switzerland. During a scheduled stop in Puerto Rico, customs inspectors searched the aircraft and discovered two suitcases belonging to defendant containing fourteen pounds of cocaine. Mejia appealed her conviction for importation, asserting that the government failed to prove that she knew she would be coming to the United States. She did not press the claim that Geronimo advances here—a lack of awareness that the drugs in her possession originated outside the United States. Indeed, as the courier transporting the drugs, she was in no position to disavow knowledge of their source. Accordingly, the language and holding of *Mejia–Lozano* addresses an alleged gap in the defendant's knowledge of the *destination* of the drugs, not their foreign *origin*.

■ Geronimo stands in a very different position than Mejia. Because he did not bring the drugs into the United States himself, he can plausibly argue that he was unaware of their foreign origin. Having established that a principal actor must have knowledge of importation under sections 952(a) and 960(a)(1), it follows that the element of scienter similarly applies to the crime of aiding and abetting importation: "Aiding and abetting requires the government to show that a defendant participated in the venture and sought by his actions to make it succeed. This burden is fulfilled by a showing that the defendant consciously shared the principal's knowledge of the underlying criminal act, and intended to help the principal." *United States v. Hernandez*, 218 F.3d 58, 65 (1st Cir.2000) (internal quotation marks and citation omitted). If the "underlying criminal act" is importation of a controlled substance, the accused must have "consciously shared the principal's knowledge" of the importation to be found guilty of aiding and abetting.

■ Nonetheless, we conclude that the jury had a sufficient evidentiary basis to find that Geronimo was aware that the drugs originated overseas. A Sprint PCS business card found in Geronimo's wallet contained an Amsterdam phone number and the chemical name for ecstacy ("MDMA") scrawled on one side. Octavio Garcia testified that he informed Geronimo on numerous occasions over a two-day period that he was waiting for Disenia Gonzalez to arrive in Boston so that he could coordinate delivery of the drugs. The defendant himself testified that he knew the "vitamins" were arriving as a shipment, and that the courier transporting them was traveling through Logan Airport. Finally, the record suggests that Nilvio (who was located in Amsterdam) and Geronimo were at least casually acquainted. Nilvio referred to Geronimo as "Miguelin," a nickname primarily used by Geronimo's immediate family. Geronimo also admitted to knowing who Nilvio was, and confirmed that Nilvio had given Geronimo's cell phone and pager numbers to Octavio Garcia. While the jurors were not compelled to credit all of this evidence, they were entitled to infer from these facts that Geronimo knew the drugs had originated overseas. Accordingly, we find no "clear and gross injustice," *Stein*, 233 F.3d at 20, in the district court's decision to enter judgment on the conviction.

**B. The Aiding and Abetting Instructions**

On appeal, Geronimo alleges error in both the initial aiding and abetting instruction, *see supra*, and the judge's clarification of the instruction in response to the jury's third question. We excerpt the reinstruction below, emphasizing the particular language challenged by the defendant:

> Aiding and abetting is not a crime in and of itself or a separate crime. Aiding and abetting is a principle under the

law whereby a person who places himself in a position knowing that another is to commit *a crime,* to assist the commission of *that crime* if necessary, if called upon, is treated by the law as if he were the principal actor. Even though he may never lift a hand, but if he stands by with the knowledge and the contingent purpose to assist the accomplishment of *the crime* should it be necessary, the law draws no distinction between what we would formally call the "principal" and the aider and abettor. *With every federal crime,* aiding and abetting makes you just as guilty as if you had committed *the crime* yourself. (emphasis added). Geronimo now argues for the first time on appeal that both the original instruction and the re-instruction were flawed because they directed the jury to review the defendant's conduct with reference to a generic "crime," rather than denoting the "principal offense" charged by the government (in this case, the importation of a controlled substance). By contrast, the defendant points us to the Eighth Circuit's Pattern Jury Instruction for Aiding and Abetting:

> A person may [also] be found guilty of [*insert principal offense*] even if [he][she] personally did not do every act constituting the offense charged, if [he][she] aided and abetted the commission of [*describe the principal offense*]. In order to have aided and abetted the commission of a crime a person must ... (1) have known [*describe principal offense*] was being committed or going to be committed; [and] (2) have knowingly acted in some way for the purpose of [causing][encouraging][aiding] the commission of [*describe principal offense*][and] (3) have [intended][known][*insert mental state required by principal offense*]. For you to find the defendant guilty of [*insert principal offense*] by reason of aiding and abet-

ting, the government must prove beyond a reasonable doubt that all of the essential elements of [*describe principal offense*] were committed by some person or persons and that the defendant aided and abetted the commission of that crime.

(emphasis added).

Geronimo contends that the district court's failure to emphasize the specific principal offense in both the original instruction and the re-instruction was particularly prejudicial under the circumstances of this case. He reasons that the government chose not to charge Geronimo with possession of a controlled substance—an offense readily apparent from the record—but rather with importation. The government's decision to prosecute Geronimo for this principal offense obliged them to prove beyond a reasonable doubt that Geronimo assisted the commission of importation specifically. In his view, the court's failure to specify the nature of the principal offense in the aiding and abetting instructions may have misled the jury into convicting him for assisting the commission of *any* crime, including possession. The defendant derives added force for his argument from the jury's questions to the court, as well as its ultimate decision to acquit on the conspiracy count. He asserts that

> [i]t is clear from the jury's questions that they acquitted on the conspiracy to import count because they found that the Defendant did not know that the drugs were imported. And, the Court's inadequate re-instructions on aiding and abetting "a crime" caused them to convict the Defendant, not for importation, but for mere possession.

■ Under plain error review, "[t]he burden [ ] rests with appellant to establish that the error was 'clear,' in the sense that

it was 'obvious,' that it affected 'substantial rights,' and that failure to vacate the [ ] conviction would result in a 'miscarriage of justice.'" *United States v. Alzanki*, 54 F.3d 994, 1003 (1st Cir.1995) (quoting *United States v. Olano*, 507 U.S. 725, 734–36, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). We acknowledge that it would be preferable for an aiding and abetting instruction to refer specifically to the principal offense in the fashion of the Eighth Circuit pattern instruction, rather than generically to "a crime." That said, we find no plain error in either of the court's instructions. The court's original instruction begins by referring to "the crime charged," establishing a context for the subsequent references to "crime." Indeed, the jury's third question to the judge reflected its understanding that importation was the relevant crime: "The verdict sheet for Count 2 says 'illegal importation' and not aiding and abetting. Why?" The repeated references to "a crime" in the court's re-instruction obviously referred to the specific offense of "illegal importation," the crime denoted on the verdict form and the subject of the jury's original question. Thus, it appears unlikely that the jurors construed either the original aiding and abetting instruction or the re-instruction as providing license to convict for conduct that did not aid the crime of importation. As the government points out, the jury's split verdict might well indicate that it found insufficient evidence of an agreement to join the charged conspiracy, while still concluding that Geronimo was aware of the drugs' origin. In the end, we conclude that the district court's jury instruction did not give rise to plain error, and we decline to set aside Geronimo's conviction on this ground.

## C. The *Petrozziello* Ruling

[ ] Geronimo contends on appeal that the district court erroneously admitted various out-of-court statements by alleged coconspirators Nilvio, Disenia Gonzalez, and Octavio Garcia. Federal Rule of Evidence 801(d)(2)(E) excludes from the category of hearsay "statement[s] by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). As a predicate for admitting evidence under this rule, the trial court must conclude that "it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy." *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir.1977). In our circuit, this determination is referred to as a *Petrozziello* ruling. The trial court is not required to decide the *Petrozziello* question prior to admitting hearsay statements under Rule 801(d)(2)(E), but may "admit the statement[s] provisionally, subject to its final *Petrozziello* determination at the close of all the evidence." *United States v. Isabel*, 945 F.2d 1193, 1199 n. 10 (1st Cir.1991). "Hence, to properly preserve an objection to a *Petrozziello* ruling, a defendant must ordinarily object both when the hearsay statements are provisionally admitted, and again at the close of all the evidence." *United States v. Newton*, 326 F.3d 253, 257 (1st Cir.2003).

We reiterate that the defense never objected at trial to the court's admission of particular coconspirator statements from Nilvio, Gonzalez, or Garcia. Indeed, the defense did not even prompt the court to issue a final *Petrozziello* ruling at the close of the evidence, but merely objected to the court's sua sponte *Petrozziello* determination:

> In terms of the *Petrozziello* rulings, I think, given the link that has been established between Disenia Gonzalez and Octavio Garcia, the transfer of the drugs from Ms. Gonzalez to Mr. Garcia, the directions Mr. Garcia received from Nilvio to contact Manny by phone or

by beeper, Mr. Garcia's testimony that the defendant met him by prearrangement at the restaurant in Lawrence, the Tipico, corroborated by the telephone records, followed by the defendant's appearance at the Days Inn to take delivery of the suitcase, establishes by a preponderance of the evidence the existence of the conspiracy and the defendant's participation in the conspiracy at all relevant times.

Even on appeal, Geronimo has failed to specify the particular hearsay statements that the district court erroneously admitted. Instead, he argues generally that "the co-conspirators' hearsay statements, including the many taped telephone conversations, should have been excluded."

Not surprisingly, the government urges us to treat Geronimo's *Petrozziello* argument as waived. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). While that approach is tempting, we assume arguendo that Geronimo properly preserved the *Petrozziello* claim below and adequately developed the argument on appeal. Under these circumstances, "[w]e review the trial court's determination that statements were coconspirator statements under the clear error standard." *United States v. Marino*, 277 F.3d 11, 25 (1st Cir.2002) (citing *United States v. Mojica–Baez*, 229 F.3d 292, 304 (1st Cir.2000)).

We discern no clear error in the district court's *Petrozziello* ruling. The defendant himself concedes that "there is clearly evidence of the existence of a conspiracy to import," and only questions the district court's finding by a preponderance of the

evidence that Geronimo himself was a party to the conspiracy. The district court rested its decision in this regard on the numerous phone calls between Geronimo and other admitted members of the conspiracy, Octavio Garcia's testimony that he arranged a preliminary meeting with Geronimo at a restaurant in Lawrence, and Geronimo's attempt to accept delivery of the ecstacy. While the jury did not determine beyond a reasonable doubt that Geronimo was guilty of the conspiracy charge, the aforementioned facts certainly permitted the judge to conclude by a preponderance of the evidence that Geronimo had joined the conspiracy. Accordingly, we decline to reverse Geronimo's conviction on *Petrozziello* grounds.[2]

### III.

Our close examination of the record reveals no basis for overturning the defendant's conviction. Accordingly, the judgment of the district court is **affirmed.**

---

**2.** On appeal, Geronimo has supplemented the brief filed by his attorney with a pro se submission alleging fatal deficiencies in the indictment, lack of subject matter jurisdiction,

*Brady* violations, and violations of his Sixth Amendment right to assistance of counsel. These arguments are facially devoid of merit, and we reject them summarily.