# United States Court of Appeals
## For the First Circuit

Nos. 11-2479, 11-2492

UNITED STATES OF AMERICA,

Appellee,

v.

JESÚS PABELLÓN RODRÍGUEZ; JIMMY CARRASQUILLO-RODRÍGUEZ,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Lipez, Circuit Judges.

José Luis Novas Debien for appellant Pabellón Rodríguez.
Michael C. Bourbeau, with whom Bourbeau & Bonilla, LLP, was on brief, for appellant Carrasquillo-Rodríguez.
Justin Reid Martin, Assistant United States Attorney, with whom Rosa Emilia Rodríquez-Veléz, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, and Julia M. Meconiates, Assistant United States Attorney, were on brief, for appellee.

August 16, 2013

**LIPEZ, Circuit Judge**.  Appellants Jimmy Carrasquillo-Rodríguez ("Carrasquillo") and Jesús Pabellón Rodríguez ("Pabellón") were convicted on drug and gun charges that arose from a reverse sting operation orchestrated by federal Drug Enforcement Administration ("DEA") agents seeking to stem the flow  of illegal narcotics from the Dominican Republic to Puerto Rico.  Both defendants challenge their convictions, primarily on sufficiency grounds.  They also claim that an error in the verdict form requires a new trial.  Carrasquillo also challenges his sentence.

The government concedes that Carrasquillo's conviction on count four (possession of a firearm with an obliterated serial number) must be vacated for insufficient evidence.  With that exception, we affirm the convictions and Carrasquillo's sentence.  The evidence was sufficient to support the convictions.  The error in the verdict form, though obvious, does not meet the stringent requirements of plain error.

**I.**

The facts, as supported by the record, are as follows.  In December 2008, the DEA created a fictional drug trafficking organization in order to target groups engaged in international drug trafficking operations.  The group consisted of three individuals: an informant from Colombia, an informant from the Dominican Republic known as "Cibaíto," and DEA Task Force Officer Jesús Marrero.  Marrero and Cibaíto played the parts of underlings

-2-

for the Colombian informant, portrayed as the boss of the organization. The group began giving Marrero's phone number to individuals involved in the illegal drug trade, advertising him as a drug distributor who received shipments from the Dominican Republic.

The group's marketing quickly paid off. On December 11, 2008, Marrero and Cibaíto met with Ramón González Duarte ("González"), a/k/a "Gigante," at a restaurant in Santo Domingo. González indicated that he wanted to purchase ninety kilograms of pure cocaine from the fictional organization, and that he wanted Marrero to transport to Puerto Rico an additional sixty kilograms of cocaine that he would be purchasing from another source. González said that he worked for a man named Cagüitas, and that they had the capacity to distribute over 500 kilograms of cocaine per week, as Cagüitas controlled the drug traffic in Caguas, Puerto Rico and the surrounding towns, and also shipped substantial amounts to the continental United States, particularly New York.

Marrero was to deliver the ninety kilograms to González's cohort in Puerto Rico at a cost of $15,000 per kilo, plus a $2,000 transportation fee. He also agreed to transport González's independently purchased sixty kilograms, charging the same transportation fee of $2,000 per kilo. Marrero told González that he needed to know who would be picking up the shipment in Puerto Rico and paying him for the shipment. González stated: "I will

call the person who is going to take care of you when you arrive in Puerto Rico. He's my son, so I trust him." He then picked up the phone, dialed a number, and placed the phone on speakerphone. The call was answered by a man identifying himself as "Hijo de Gigante," or "Son of Gigante," who was later identified as Carrasquillo. (Carrasquillo is González's stepson.) At some point during the call, Carrisquillo handed the phone to Cagüitas, who stated that Carrasquillo would be the individual in charge of receiving the cocaine and making the payment to Marrero.

Despite their tentative agreement, Marrero never received the sixty kilograms that González had asked him to transport to Puerto Rico. On December 15, Marrero called Carrasquillo to inform him that he had returned from the Dominican Republic. Using coded language, Carrasquillo asked Marrero if he had received the drug cargo and was ready to exchange the drugs for money. The next day, Marrero called Cagüitas, who told him that he would be sending Carrasquillo to exchange cash for the drugs. Cagüitas put Carrasquillo on the phone, who told Marrero to meet him at the kiosks in Luquillo later that day.

When Marrero arrived at the kiosk, he met Carrasquillo and Carrasquillo's driver, Jiel Sánchez. Because Marrero had taken longer than Carrasquillo and his compatriots had expected, the unidentified people to whom Carrasquillo's organization was to sell the drugs were no longer willing to front the money, and would pay

only upon seeing the drugs. Carrasquillo asked for a credit, meaning that Marrero would hand over the shipment for nothing, with Carrasquillo paying him back later with the proceeds of his sale to other parties. Carrasquillo's organization negotiated with Cibaíto (the informant in the Dominican Republic), whereby the drugs would be extended to the organization on a credit. The "guarantee" was González himself: he was to stay at Cibaíto's house in the Dominican Republic until the payment for the ninety kilos was delivered.

Marrero, however, would not accept a credit for the transportation costs associated with the drugs. As Marrero had told them that the drugs cost $2,000 per kilo to ship, Carrasquillo would have to come up with $180,000 before he received the ninety kilos. Because of Carrasquillo's cash flow problems, the parties agreed that Marrero would give Carrasquillo the drugs in a series of smaller transactions. He would hand off the first thirty kilos to Carrasquillo for the transportation cost of $60,000. Carrasquillo would then sell the drugs, returning a few hours later to give Marrero another $60,000 for a second thirty kilo bale. Only sixty kilos were to be transferred pursuant to this arrangement. The parties agreed that this transaction would take place the next day, December 17, at a kiosk in Luquillo.

Marrero arrived at the kiosk and sat down at a table. Shortly thereafter, Jiel Sánchez arrived with an individual unknown

to Marrero, later identified as Pabellón. Pabellón is Carrasquillo's brother and González's stepson. Without greeting Marrero, Sánchez and Pabellón looked around the kiosk, went to the counter, ordered a beer, went to the door of the bathroom, and then left quickly. Upon exiting, the pair surveilled the parking lot in the back and side of the establishment. Apparently satisfied that the coast was clear, one of them placed a call. Carrasquillo arrived about eight minutes later.

Carrasquillo and Marrero had a conversation, during which Carrasquillo said that the money was on its way and repeatedly demanded that Marrero show him the drugs. Marrero told him that until he saw the money, Carrasquillo would not see the drugs. After making a few phone calls, Carrasquillo told Marrero that the money was at another kiosk, and asked Marrero to accompany him there. Because there was no surveillance at the second kiosk, Marrero refused, stating that the drugs were close by and he did not want to be separated from them. With both parties refusing to budge, Marrero terminated the meeting.

The next day, December 18, with the deal still uncompleted, Marrero called González to complain. Marrero objected to being surveilled by Sánchez and Pabellón, and generally objected to the presence of anyone but Carrasquillo at the meetings. González explained that the group was nervous because they had seen a car parked at the kiosk with people inside. Marrero and González

both expressed suspicion as to the other's credentials in the drug trade, with González noting that no one in the Dominican Republic appeared to have heard of Marrero.

Later that same day, Marrero spoke to González's boss, Cagüitas. Marrero and Cagüitas agreed that Carrasquillo would meet Marrero in the parking lot of the Metropol restaurant in Fajardo later that day. Marrero insisted that Carrasquillo come alone. Before Marrero arrived at the restaurant, a DEA task force agent observed a blue Toyota pull into the parking lot, followed by a black Honda. The agent recognized the Honda: it was the same car that Sánchez and Pabellón had driven to the kiosk the day before. Marrero arrived and made his way to the Toyota, which Carrasquillo had driven to the meeting. Marrero asked Carrasquillo where the money was, and Carrasquillo removed a plastic bag containing $59,000 from underneath the driver's seat. After briefly examining the contents, Marrero called his surveillance to give the signal for the arrest.

After receiving Marrero's signal, DEA Task Force Agent Edwin Colón-García and two other officers moved in and arrested Carrasquillo. Meanwhile, Agent Jimmy Alverio-Hernández parked his vehicle in front of the black Honda and moved around to the Honda's front passenger side door, where he observed what appeared to be a weapon under a blue rag on the floor of the front passenger seat. After alerting his fellow officers about the gun, the agent ordered

the passenger of the Honda, later identified as Pabellón, out of the car and placed him under arrest. Agents also arrested the driver of the Honda, Jiel Sánchez. The weapon on the floor of the front passenger seat was determined to be a .45 caliber Ruger pistol with an obliterated serial number.

On December 23, 2009, Carrasquillo, Pabellón, and González were indicted for conspiracy to possess with intent to distribute five kilograms or more of cocaine (count one) and conspiracy to import into the United States from the Dominican Republic five kilograms or more of cocaine (count two). Carrasquillo and Pabellón were also both charged with possession of a firearm in furtherance of a drug trafficking crime, specifically the alleged conspiracy (count three), and possession of a firearm with an obliterated serial number (count four). Pabellón alone was charged with being a felon in possession of a firearm (count five).

Defendants' jury trial began on February 7, 2011. On February 11, the jury found defendants guilty on all counts. After the denial of motions for judgments of acquittal pursuant to Federal Rule of Criminal Procedure 29, defendants were sentenced. González received a sentence of 120 months. Carrasquillo was sentenced to 144 months on counts one and two, and 60 months on count four, to be served concurrently with one another. The court also imposed a mandatory 60-month consecutive sentence on count three, resulting in a total sentence for Carrasquillo of 204

months.  Pabellón received a 135-month sentence on counts one and two, a 60-month sentence for count four, and a 120-month sentence for count five, all to be served concurrently with each other. Like Carrasquillo, Pabellón received a mandatory 60-month consecutive sentence for count three, resulting in a total sentence of 195 months.  This timely appeal followed.[1]

## II.

Both defendants challenge the sufficiency of the evidence underlying certain of their convictions.  Although he was convicted on counts one through four, Carrasquillo raises a sufficiency challenge only as to counts three and four (the firearm-related counts).  Pabellón, on the other hand, raises no sufficiency challenge to the firearm-related counts on which he was convicted (counts three through five), focusing instead on the two drug conspiracy counts (counts one and two).

We review preserved challenges to the sufficiency of evidence de novo.  United States v. Ihenacho, 716 F.3d 266, 279 (1st Cir. 2013).  In analyzing such claims, we consider "'whether any rational factfinder could have found that the evidence presented at trial, together with all reasonable inferences, viewed in the light most favorable to the government, established each element of the particular offense beyond a reasonable doubt.'"

---

[1] González did not appeal his convictions or sentence.

United States v. Willson, 708 F.3d 47, 52 (1st Cir. 2013) (quoting United States v. Poulin, 631 F.3d 17, 22 (1st Cir. 2011)).

## A. Carrasquillo

As noted, Carrasquillo challenges the sufficiency of the evidence underlying his convictions for possessing a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A) (count three) and possessing a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k) (count four). Because the government concedes that the evidence was not sufficient to establish that Carrasquillo knew Pabellón would possess a firearm carrying an obliterated serial number,[2] we need only consider Carrasquillo's challenge to his count three conviction.

For a conviction under § 924(c)(1)(A), "the government must prove that the defendant (1) committed a drug trafficking crime; (2) knowingly possessed a firearm; and (3) possessed the firearm in furtherance of the drug trafficking crime." United States v. Vázquez-Castro, 640 F.3d 19, 25 (1st Cir. 2011). We have noted an important caveat to the second and third prongs of this analysis: "[u]nder Pinkerton v. United States, 328 U.S. 640 (1946),

_____

[2] Although we vacate Carrasquillo's conviction and sentence on count four, we need not remand for resentencing. The count four sentence runs concurrently with the 144-month sentence for counts one and two, which we affirm. Neither Carrasquillo nor the government argues that a resentencing is necessary in light of the government's concession that count four must be vacated.

-10-

the defendant does not need to have carried the gun himself to be liable under § 924(c)." United States v. Flecha-Maldonado, 373 F.3d 170, 179 (1st Cir. 2004). Rather, "[s]o long as there is sufficient evidence that a co-conspirator carried or used a firearm in furtherance of the conspiracy and that this was reasonably foreseeable to the defendant, the defendant can be held liable as if he himself carried or used the firearm."[3] Id.

Carrasquillo concedes that the evidence presented at trial "clearly established" a drug conspiracy between himself and González to (1) possess cocaine with intent to distribute, and (2) import cocaine into the United States from the Dominican Republic, thereby satisfying the first prong of the § 924(c)(1)(A) analysis. He maintains, however, that the government failed to produce any

---

[3] Carrasquillo also argues that the district court erred in instructing on Pinkerton liability as to counts three and four. Because he failed to object to this alleged error at trial, our review is for plain error. This standard "imposes a heavy burden on the appellant, who must demonstrate: (1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of the judicial proceedings." United States v. Ramos-Mejía, No. 12-1738, 2013 WL 3287077, at *1 (1st Cir. July 1, 2013) (internal quotation marks omitted). Because we find that there was sufficient evidence to enable a jury to conclude, beyond a reasonable doubt, that Carrasquillo and Pabellón were members of a drug conspiracy, see infra Part II(B), there was no "clear or obvious" error in instructing the jury on the Pinkerton theory of liability with respect to counts three and four, see United States v. Vázquez-Castro, 640 F.3d 19, 25 (1st Cir. 2011) (finding that Pinkerton charge was proper on substantive weapons count because government presented sufficient evidence that defendant and his co-defendants were members of cocaine conspiracy (that weapon was alleged to have been used in furtherance of)).

evidence that the weapon recovered was possessed by a member of the conspiracy during the conspiracy's course. Additionally, he argues that there is no evidence that Carrasquillo knew his co-conspirator was carrying a firearm, or that it was reasonably foreseeable that his co-conspirators were likely to be carrying firearms during the course of the conspiracy and in furtherance thereof.

First, there was sufficient evidence presented at trial to allow a rational trier of fact to conclude that Pabellón possessed the pistol during and in furtherance of the conspiracy. Pabellón and Sánchez escorted Carrasquillo's car into the parking lot of the Metropol restaurant, where Carrasquillo was to exchange $59,000 for 30 kilograms of cocaine. The loaded .45 caliber Ruger was directly below Pabellón's seat. Given Sánchez and Pabellón's prior countersurveillance activities at the December 17 kiosk meeting between Carrasquillo and Marrero, a rational factfinder could conclude that Sánchez and Pabellón attended the Metropol restaurant meeting to provide protection for Carrasquillo (and the $59,000) in furtherance of the drug conspiracy, and that the presence of the gun was directly related to the pair's security role. See United States v. Marin, 523 F.3d 24, 27 (1st Cir. 2008) (noting that "possession of a firearm to protect drugs or sales proceeds" is sufficient to establish the nexus between the firearm and the drug crime).

Carrasquillo emphasizes that Sánchez and Pabellón were parked several cars away from the prospective site of the transaction, and suggests that the gun in their car was therefore not "possessed . . . in furtherance of the drug trafficking crime." However, "a gun need not be present at the moment that drugs are verified, or at the moment that money or drugs change hands, in order to be possessed in furtherance of a drug trafficking crime." United States v. Alverio-Meléndez, 640 F.3d 412, 420 (1st Cir. 2011). For the purposes of establishing a nexus between the handgun and the conspiracy, it is sufficient that the jury could reasonably conclude that Carrasquillo had an armed escort in the same parking lot in which the drug transaction was to take place.

Second, there was sufficient evidence to support the finding that it was reasonably foreseeable to Carrasquillo that one of his co-conspirators in the escort vehicle would possess a firearm in furtherance of their drug conspiracy. In the first transaction alone Carrasquillo intended to pick up over $400,000 worth of cocaine. He was then going to sell at least $60,000 of the cocaine that same day, using those proceeds to acquire another thirty-kilo bale. "Because firearms are considered 'common tools of the drug trade,' a co-defendant's possession of a dangerous weapon 'is foreseeable to a defendant with reason to believe that their collaborative criminal venture includes an exchange of controlled substances for a large amount of cash.'" United States

v. Thongsophaporn, 503 F.3d 51, 58 (1st Cir. 2007) (quoting United States v. Bianco, 922 F.2d 910, 912 (1st Cir. 1991)); see also United States v. Collazo-Aponte, 216 F.3d 163, 196 (1st Cir. 2000) (noting that "the illegal drug industry is, to put it mildly, a dangerous, violent business," and that "[a]s a corollary, the use of firearms is foreseeable in trafficking offenses involving substantial quantities of drugs" (internal quotation marks omitted)), vacated on other grounds, 532 U.S. 1036 (2001). The quantity of both the cash and the drugs that Carrasquillo and his co-conspirators hoped to exchange during the course of their conspiracy was substantial by any measure.

Under these circumstances, a rational jury could have concluded that it was reasonably foreseeable to Carrasquillo that one of his co-conspirators would carry a firearm to the Metropol restaurant meeting. See Vázquez-Castro, 640 F.3d at 27. The district court therefore properly denied Carrasquillo's motion for a judgment of acquittal on count three.

**B. Pabellón**

As noted, Pabellón challenges the sufficiency of the evidence underlying his convictions for conspiracy to possess with intent to distribute a controlled substance (count one) and conspiracy to import a controlled substance (count two).

To prove the existence of a conspiracy, "the government must prove beyond a reasonable doubt: (1) that an agreement existed

-14-

to commit the particular crime; (2) that the defendant knew of the agreement; and (3) that he voluntarily participated in it." <u>United States</u> v. <u>Cruz-Rodríquez</u>, 541 F.3d 19, 26 (1st Cir. 2008). "Such an agreement may be express or tacit, that is, represented by words or actions, and may be proved by direct or circumstantial evidence." <u>United States</u> v. <u>Rivera Calderón</u>, 578 F.3d 78, 88 (1st Cir. 2009).

Pabellón maintains that the evidence presented at trial "gives equal or nearly equal support to a theory of guilt and a theory of innocence." He states that he is not mentioned in any of the recorded calls that were submitted into evidence, and that the only actual evidence linking him to the conspiracy is his presence in two places -- the kiosk where the original drug deal was supposed to take place, and the parking lot of the Metropol restaurant the next day, where Carrasquillo and Marrero were to make their second attempt at exchanging drugs for money.

Marrero's testimony supported the conclusion that Pabellón was conducting countersurveillance and providing protection to Carrasquillo at the December 17 meeting between Carrasquillo and Marrero. The same conclusion, based on Marrero's testimony and that of the other agents present at the bust, could have been drawn regarding Pabellón's presence at the Metropol restaurant. Although there was no evidence that Pabellón took part in the negotiations between Marrero and Carrasquillo/González

regarding the purchase price of the drugs or the transfer of the kilos, "a drug conspiracy may involve ancillary functions (e.g., accounting, communications, strong-arm enforcement), and one who joined with drug dealers to perform one of those functions could be deemed a drug conspirator." United States v. García-Torres, 280 F.3d 1, 4 (1st Cir. 2002); see also United States v. Soto-Beníquez, 356 F.3d 1, 18 (1st Cir. 2004) ("Advancing the aim of the conspiracy can involve performing ancillary functions such as processing and cooking drugs, procuring weapons, collecting monies, enforcing discipline, chastising rivals, accounting, and the like, as long as such actions are performed with the aim of furthering the conspiracy."). It therefore follows that although the evidence may suggest that Pabellón was merely the "muscle" and not the "brains" of the operation, this fact does not make him a mere "peripheral" character unworthy of the designation of conspirator. The district court therefore properly denied Pabellón's motion for judgment of acquittal on count one.

There is less evidence supporting Pabellón's importation conspiracy conviction, which requires that he knew the drugs were imported. See United States v. Geronimo, 330 F.3d 67, 72 (1st Cir. 2003) ("[T]o convict a principal actor of importing a controlled substance, the prosecution must prove that the accused knew the drugs were imported."). Still, there is enough circumstantial evidence to permit a reasonable jury to conclude that Pabellón knew

-16-

that the drugs sought to be purchased by the conspiracy came from the Dominican Republic. First, there was the relationship between the three defendants: Pabellón and Carrasquillo are brothers, and González is their stepfather. There was substantial evidence that both González and Carrasquillo knew that the drugs were imported. It would not be unreasonable for the jury to infer that Pabellón's brother and stepfather shared with him the details of the plan. See, e.g., United States v. Bollinger, 796 F.2d 1394, 1405 (11th Cir. 1986) (noting that defendant's extensive dealings with several co-conspirators who knew that the contraband was imported is factor supporting inference that defendant also knew drugs were imported). Second, and relatedly, Pabellón's own stepfather (González) was to serve as human collateral for the purchase price of the drugs; specifically, he was to stay at Cibaíto's house in the Dominican Republic until the ninety kilos were paid for. Third, Pabellón was a part of the deal to give $60,000 in transportation costs for bringing drugs from the Dominican Republic to Puerto Rico in exchange for cocaine. It would be reasonable for a jury to find that, as a participant in the exchange, Pabellón knew the purpose and amount of the money involved.

In short, these pieces of circumstantial evidence, taken together, were sufficient to allow a reasonable jury to conclude that Pabellón knew that the drugs were imported. The district

-17-

court therefore properly denied Pabellón's motion for judgment of acquittal on count two.

### III.

The defendants argue that the verdict form was faulty because it erroneously instructed the jury that, to find them not guilty, it had to find that they were innocent beyond a reasonable doubt. For example, the verdict form for Carrasquillo's count three charge reads as follows:

> 3. Count Three charges co-defendant Jimmy Carrasquillo-Rodríguez of knowingly possessing a firearm in furtherance of a drug trafficking crime. We the jury, unanimously find, beyond a reasonable doubt, that Jimmy Carrasquillo-Rodríguez, as to Count Three is:
>
> ___ Not Guilty    ___ Guilty

This same format was used on the verdict form for each count as to each defendant.

We review the verdict form "as a whole, in conjunction with the jury instructions, in order to determine whether the issues were fairly presented to the jury." United States v. Riccio, 529 F.3d 40, 47 (1st Cir. 2008). Because there were no objections below to this language in the verdict form, we review for plain error. United States v. González-Vélez, 466 F.3d 27, 34-35 (1st Cir. 2006). To satisfy this standard, defendants "must show: (1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public

-18-

reputation of judicial proceedings." United States v. Brown, 669 F.3d 10, 28 (1st Cir. 2012) (internal quotation marks omitted). This standard is "so demanding that we have characterized it as cold comfort to most defendants pursuing claims of instructional error." Id. (internal quotation marks omitted); see also United States v. Paniagua-Ramos, 251 F.3d 242, 246 (1st Cir. 2001) ("[T]he plain error hurdle, high in all events, nowhere looms larger than in the context of alleged instructional errors.").

The language in the verdict form constitutes clear and obvious error, thereby satisfying the first two prongs of the plain error analysis. It is fundamental that a criminal defendant, presumed innocent, can be found guilty only if the government proves guilt beyond a reasonable doubt. See In re Winship, 397 U.S. 358, 361-64 (1970); Brinegar v. United States, 338 U.S. 160, 174 (1949). The verdict form suggested to the jury that it could find defendants not guilty only if it found that their innocence had been established beyond a reasonable doubt. By suggesting that the defendants had the burden of proving their innocence, the verdict form had serious constitutional implications. See Sullivan v. Louisiana, 508 U.S. 275, 277 (1993) ("What the factfinder must determine to return a verdict of guilty is prescribed by the Due Process Clause."); id. at 278 ("[T]he jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt."); In re Winship, 397 U.S. at 364. The district court

-19-

should never have allowed this verdict form to go to the jury. See United States v. Cardinas Garcia, 596 F.3d 788, 799 (10th Cir. 2010) (stating verdict form with identical error "should have been differently worded"); United States v. Bustos, 303 F. App'x 656, 663 (10th Cir. 2008) (same).

But even an error with constitutional implications is subject to the traditional four-prong plain error analysis. See United States v. George, 676 F.3d 249, 257 (1st Cir. 2012); United States v. Catalan-Roman, 585 F.3d 453, 463 n.8 (1st Cir. 2009); United States v. Rodríguez-Lozada, 558 F.3d 29, 38 (1st Cir. 2009). Defendants must therefore satisfy the heavy burden imposed by the third prong of showing that the error "affected their substantial rights." In other words, defendants "must show 'a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different.'" United States v. Hebshie, 549 F.3d 30, 44 (1st Cir. 2008) (alteration in original) (quoting United States v. Padilla, 415 F.3d 211, 221 (1st Cir. 2005) (en banc) (internal quotation marks omitted)). Although this showing does not require that "a defendant prove by a preponderance of the evidence that but for [the] error things would have been different," United States v. Dominguez Benitez, 542 U.S. 74, 83 n.9 (2004), we will nevertheless sustain a conviction if we find that "the result would quite likely have been the same" had the

-20-

erroneous instruction not been included, <u>United States</u> v. <u>O'Brien</u>, 435 F.3d 36, 40 (1st Cir. 2006).

Defendants cannot clear this high hurdle. First, Jury Instruction No. 2 gave a comprehensive, thorough, and accurate explanation of the government's burden of proof and defendants' presumption of innocence.[4] Because the jury instructions and the verdict form must be read in conjunction with one another, <u>see</u> <u>Brown</u>, 669 F.3d at 31, the precision of the reasonable doubt standard in the jury instructions is relevant to our analysis of the potential prejudicial impact of the language in the verdict form.

---

[4] For example, one paragraph of the district court's eight-paragraph Jury Instruction No. 2 reads as follows:

> The presumption of innocence until proven guilty means that the burden of proof is always on the government to satisfy you that a defendant is guilty of the crimes with which he has been charged beyond a reasonable doubt. The law does not require that the government prove guilt beyond all possible doubt; proof beyond a reasonable doubt is sufficient to convict. This burden never shifts to a defendant. It is always the government's burden to prove each of the elements of the crimes charged beyond a reasonable doubt by the evidence and the reasonable inferences to be drawn from that evidence. A defendant has the right to rely upon the failure or inability of the government to establish beyond a reasonable doubt any essential element of an offense charged against him or her.

Second, we customarily assume that jurors follow the instructions given to them by the district court. See Morales-Vallellanes v. Potter, 605 F.3d 27, 34-35 (1st Cir. 2010) ("A basic premise of our jury system is that the jury follows the court's instructions, and therefore we assume, as we must, that the jury acted according to its charge." (internal quotation marks omitted)). Although the verdict form contained language suggesting that innocence had to be proven beyond a reasonable doubt, it also instructed that the jury could only find guilt if it found so beyond a reasonable doubt. In addition to the language in the verdict form making this requirement clear, the jury instructions as to each specific count were also unambiguous about the showing necessary to support a guilty verdict. In the instructions on counts one and two, for example, the paragraph preceding the elements of the offense reads as follows: "For you to find a particular defendant guilty of conspiracy, you must be convinced that the government has proven each of the following things beyond a reasonable doubt." The jury instructions on counts three through five contain similar language before listing the elements of those crimes: "For you to find [defendant] guilty of this crime, you must be satisfied that the government has proven each of the following things beyond a reasonable doubt." Given these instructions -- which were read aloud by the judge before deliberations began, and a copy of which were with the jury during their deliberations -- we

presume that when the jurors checked the "guilty" boxes on the verdict form, they did so understanding that they could check that box only if they found that the government had in fact proved that defendants were guilty beyond a reasonable doubt.

Finally, defendants put forward nothing to suggest that they suffered prejudice from the erroneous language in the verdict form. Instead of attempting to demonstrate actual prejudice, defendants merely focus on the egregiousness of the error, concluding that the language imposed an "impermissible burden" which "negated" their "entitlement as a matter of law to an acquittal should the Government's evidence . . . be deemed insufficient." This error was especially injurious, they maintain, because of the "nominal amount of evidence" the government presented at trial.

First, the evidence was far from nominal; indeed, it was substantial. Second, this sort of general argument is insufficient to "show that the error likely 'affected the outcome of the district court proceedings.'"[5] Hebshie, 549 F.3d at 44 (emphasis

---

[5] Some state courts have found that the use of nearly identical language in verdict forms constitutes error warranting a new trial, despite the fact that the defendants in those cases, like defendants here, failed to challenge the verdict forms at trial. See Cheddersingh v. State, 724 S.E.2d 366, 371 (Ga. 2012); State v. McNally, 922 A.2d 479, 483 (Me. 2007); cf. State v. Johnson, 842 P.2d 1287, 1289 (Ariz. 1992) (reversing where court gave a similarly erroneous oral instruction). Although these courts appear to apply a standard of review similar to the federal plain error standard, none of these decisions contain a prejudice analysis -- or at least the type of prejudice analysis that we are

-23-

added) (quoting <u>United States</u> v. <u>Olano</u>, 507 U.S. 725, 734 (1993));

see <u>Jones</u> v. <u>United States</u>, 527 U.S. 373, 394-95 (1999) ("Where the

effect of an alleged error is so uncertain, a defendant cannot meet

his burden of showing that the error actually affected his

substantial rights.").

Having failed to establish prejudice, defendants cannot

show that the language in the verdict form constituted plain error

sufficient to warrant a new trial.

IV.

Pabellón maintains that the district court's instructions

on count two were erroneous in that they failed to properly

instruct the jury as to the scienter element of the offense.

Specifically, he argues that the instructions failed to specify

that in order to convict him on count two, the jury needed to find

that he had knowledge that the drugs that were the subject of the

deal had been imported from outside the United States.  Because

Pabellón failed to object to the jury instruction, our review is

again limited to plain error.  <u>United States</u> v. <u>LaPlante</u>, 714 F.3d

641, 643 (1st Cir. 2013).

---

obligated to undertake on plain error review.  These courts may
either be applying a relaxed state law version of the plain error
standard, or, though not denominated as such, structural error
analysis (though in <u>McNally</u> the Supreme Judicial Court of Maine
explicitly stated that it was <u>not</u> basing its decision on structural
error, 922 A.2d at 483 n.1).  Because defendants do not allege that
the verdict form constituted structural error, we do not address
that argument.  Also, we are not suggesting that this argument
would be viable.

Here there was no error, much less plain error.  As to count two, the instructions read in relevant part:

> Defendants Jimmy Carrasquillo-Rodríguez, Jesús Pabellón-Rodríguez, and Ramon González-Duarte are accused of conspiring to commit a federal crime -- specifically, the crime of importing into the United States from the Dominican Republic, five kilograms or more of cocaine. . . .
> For you to find a particular defendant guilty of conspiracy, you must be convinced that the government has proven each of the following things beyond a reasonable doubt:
> First, that the agreement specified in the indictment . . . existed between at least two people to import into the United States from the Dominican Republic, five kilograms or more of cocaine; and
> Second, that the defendant willfully joined in that agreement;
>
> . . . .
>
> To act "willfully" means to act voluntarily and intelligently and with the specific intent that the underlying crime be committed -- that is to say, with bad purpose, either to disobey or disregard the law -- not to act by ignorance, accident or mistake. <u>The government must prove two types of intent beyond a reasonable doubt before a defendant can be said to have willfully joined the conspiracy</u>: an intent to agree <u>and an intent, whether reasonable or not, that the underlying crime be committed</u>. . . .

(Emphasis added.)  A finding of guilty on count two therefore required that to "willfully" join the conspiracy to import cocaine from the Dominican Republic to the United States, Pabellón had to intend that the underlying crime -- "specifically, the crime of importing into the United States from the Dominican Republic, five

kilograms or more of cocaine" -- be committed.  The instruction embraces the concept of knowledge that the drugs were imported: if one intends to bring drugs from the Dominican Republic to the United States, one must have knowledge that the drugs are being brought into the United States across national borders.  The district court's instructions on count two were therefore not improper, much less plainly erroneous.[6]

V.

Carrasquillo challenges his sentence, arguing that the district court failed to consider the application of United States Sentencing Guidelines ("U.S.S.G.") § 2D1.1, Application Notes 12 and 14.  We consider his arguments as to each of these Notes in turn.

Note 12 states in pertinent part:

[I]n a reverse sting, the agreed-upon quantity of the controlled substance would more accurately reflect the scale of the offense because the amount actually delivered is controlled by the government, not by the defendant.  If, however, the defendant establishes that the defendant did not intend to provide or purchase, or was not reasonably capable of providing or purchasing, the agreed-upon quantity of the controlled substance, the court shall exclude from the offense level determination the amount of controlled substance that the defendant

_____

[6] Pabellón also argues that the cumulative effect of the errors he asserts undermines the jury's determination of guilt.  We have identified only one error related to his conviction: the erroneous language in the verdict form.  There is no cumulative error argument available to him.

-26-

> establishes that the defendant did not intend to provide or purchase or was not reasonably capable of providing or purchasing.

U.S.S.G. § 2D1.1 cmt. n.12 (2011). Carrasquillo maintains that the conspirators' inability to pay for the ninety kilograms of cocaine up front shows that they were not "reasonably capable of purchasing" such a large amount of drugs.

We review a district court's factual findings as to drug quantity under the sentencing guidelines for clear error. United States v. Correa-Alicea, 585 F.3d 484, 489 (1st Cir. 2009). Here the agreed-upon quantity was ninety kilograms. This quantity shall be reduced under Application Note 12 only if "the defendant establishes that the defendant did not intend to provide or purchase, or was not reasonably capable of providing or purchasing, the agreed-upon quantity of the controlled substance." U.S.S.G. § 2D1.1 cmt. n.12 (emphasis added).

Carrasquillo never put forward evidence indicating that he and his co-conspirators were not reasonably capable of purchasing the ninety kilograms of cocaine that they agreed to purchase. Although Carrasquillo and his co-conspirators were only able to come up with an initial $59,000 to receive the first thirty-kilo bale, they were to use the profits from the sale (that same day) of the first bale to fund the purchase of the second bale, which they would then sell to purchase a third bale. The conspirators were so confident that they could pay the purchase

price of the drugs that they were willing to bet González's life on it. We therefore conclude that the district court did not err in failing to reduce Carrasquillo's offense level under the circumstances set out in Note 12.

> Note 14 states:

> If, in a reverse sting (an operation in which a government agent sells or negotiates to sell a controlled substance to a defendant), the court finds that the government agent set a price for the controlled substance that was substantially below the market value of the controlled substance, thereby leading to the defendant's purchase of a significantly greater quantity of the controlled substance than his available resources would have allowed him to purchase except for the artificially low price set by the government agent, a downward departure may be warranted.

Id. cmt. n.14. Carrasquillo maintains that his sentence should be reduced pursuant to Application Note 14 because the government, by agreeing to transfer control of the drugs to Carrasquillo based substantially on credit, agreed to sell the drugs at a price "substantially below the market value."

We find this argument unconvincing. Although there may be instances in which a "credit arrangement" could implicate the issues identified in Application Note 14, see United States v. Ruiz, 446 F.3d 762, 774-75 (8th Cir. 2006) ("A generous credit arrangement becomes increasingly suspect where the government possesses limited assurances of the defendant's ability to be trusted with repayment."), the human collateral arrangement here --

particularly given the relationship between the co-conspirators -- seriously undermines any argument that Application Note 14 applies. Furthermore, Carrasquillo put forward no evidence suggesting that such credit arrangements are uncommon in the drug trafficking trade, or that the terms of this credit arrangement were more generous than in the usual case.  It was therefore not clear error for the district court to fail to reduce Carrasquillo's offense level pursuant to Application Note 14.

VI.

For the foregoing reasons, we <u>affirm</u> Pabellon's convictions on all counts.  We <u>affirm</u> Carrasquillo's convictions and their sentences as to all counts except count four.  We <u>vacate</u> Carrasquillo's conviction and sentence for count four.

<u>So ordered</u>.